In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3486

MARIKO L.A. BENNETT, *et al.*,

*Plaintiffs-Appellants*,

*v.*

SOUTHWEST AIRLINES CO.,
THE BOEING COMPANY, and
CITY OF CHICAGO,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 06 C 317 *et al.*—**Charles P. Kocoras**, *Judge.*

ARGUED APRIL 5, 2007—DECIDED APRIL 26, 2007

Before EASTERBROOK, *Chief Judge*, and BAUER and
WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Southwest Airlines flight
1248 landed in a snowstorm at Chicago Midway Interna-
tional Airport on December 8, 2005. Conditions were
near the federal minimum for safe landings on Midway's
Runway 31C, which at 6,522 feet is among the shortest
main runways at a commercial airport. A successful
landing of the Boeing 737-700 depended on the pilot's
ability to come in at a moderate speed, touch down near
the start of the runway, and apply the thrust reversers
promptly. As things turned out, however, the wheels

touched down 2,000 feet into the runway and thrust reversers did not deploy until 18 seconds later, when the plane was only 1,000 feet from the runway's end. The plane smashed through a barrier and a fence; it came to rest in a street, where it crushed a car and killed one of the occupants. Twelve other people on the ground were injured, though the plane's 98 passengers and five crewmembers were safe.



Tort suits filed in state court have been removed by the defendants (Southwest, Boeing, and Chicago) on the theory that plaintiffs' claims arise under federal law. See 28 U.S.C. §1331, §1441(a). The district court denied a motion to remand but certified the decision for interlocutory appeal, which we accepted. 28 U.S.C. §1292(b). Defendants' early theory that federal law occupies the field of aviation safety and thus "completely preempts" all state law has been abandoned. We must decide whether plaintiffs' claims arise under federal law because federal aviation standards play a major role in a claim that Southwest (as operator of the flight), Boeing (as manufacturer of the airframe), or Chicago (as operator of the airport) acted negligently.

Illinois tort law supplies the claim for relief. On that much all parties agree. For decades aviation suits have been litigated in state court when the parties were not of diverse citizenship. Most plaintiffs in this suit are citizens of Illinois, as are both Boeing and the City of Chicago, so jurisdiction cannot be maintained under 28 U.S.C. §1332. But *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 314 (2005), held that a claim nominally resting on state law may "arise under" federal law, permitting removal under §1441(a), when it "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Defendants maintain, and the district court held, that this standard is satisfied for aviation accidents because of the dominant role that federal law plays in air transport.

Notice how we put this: The defendants do not contend, nor did the district court find, that resolution of this suit revolves around any *particular* disputed issue of federal law. For all we can see, everything will depend on a fact-bound question such as whether the pilots should have

executed a missed approach or, having elected to land, exercised adequate diligence in activating the thrust reversers; whether Boeing should have told air carriers not to count on thrust reversers when calculating how much runway they need; or whether Chicago should have closed the airport because of bad weather. The meaning of federal statutes and regulations may play little or no role. As defendants (and the district court) saw things, however, this does not matter: *all* suits about commercial air travel belong in federal court because the national government is the principal source of rules about safe air transportation, and uniform application of these norms is desirable. So put, the argument would extend *Grable* and the arising-under jurisdiction well beyond the scope the Justices are willing to tolerate.

In the main, a claim "arises under" the law that creates the cause of action. See *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257 (1916) (Holmes, J.). The Court has ruled, however, that this is a sufficient rather than a necessary condition of the arising-under jurisdiction, see *Gully v. First National Bank in Meridian*, 299 U.S. 109 (1936), and by holding out the possibility (realized in *Grable*) that a contested federal *issue* in a state-law suit may allow jurisdiction under §1331 the Court has greatly complicated the analysis. For the Court has also held that a federal issue, even an important one, usually is insufficient for §1331 jurisdiction.

*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986), provides a good example. Thompson alleged that a drug that the Food and Drug Administration had approved for sale was inadequately labeled as a matter of federal law, and that this shortcoming should lead to recovery in tort under state law. The drug's manufacturer argued that this claim arose under federal law because the adequacy of the label must be assessed under federal substantive standards. The Supreme Court granted the

premise—that a court must apply federal law to determine whether the drug had been labeled properly—but denied the conclusion that this made the plaintiff's claim "arise under" federal law. Whether poor labeling supports recovery, and if so what damages are appropriate, are matters of state law that belong in state court, the Justices concluded.

*Grable* reached a different conclusion when the state proceeding amounted to a collateral attack on a federal agency's action. The IRS seized a parcel of Grable's land; although the agency gave notice by certified mail, Grable did not request a hearing, so the IRS sold the land and applied the proceeds to Grable's taxes. Grable did not redeem within 180 days of the sale. Years later it filed a quiet-title action under state law, contending that it should be confirmed as the parcel's owner because the IRS's notice did not satisfy federal requirements. The only contested issue in the suit was one of federal law, and the main effect of the suit if Grable should prevail would be to require the federal government to reimburse the parcel's buyer, disgorging money that had been credited as taxes. The Court held that such a claim arises under federal law because, apart from the procedural device (a quiet-title action), there was *nothing* in it but federal law, with the potential to affect the national government's revenues. The Court thought a federal forum especially appropriate for contests arising from a federal agency's performance of duties under federal law, doubly so given the effect on the federal Treasury.

Defendants' argument that *Grable* brings within §1331 all actions in which federal law may play an important role was made to the Supreme Court in *Empire Healthchoice Assurance, Inc. v. McVeigh*, 126 S. Ct. 2121 (2006), and squelched. Empire Healthchoice, which administered a program of health insurance for federal employees, filed suit in federal court seeking to recover from an insured

who had settled a tort claim and failed to turn over any of the proceeds as the policy's subrogation clause required. Empire Healthcare's theory was that because the policy's terms, including the requirement of reimbursement, had been prescribed by federal regulation, the claim for reimbursement itself arises under federal law. The Court held, however, that the claim arose under the contract—and, as in *Merrell Dow*, that the influence of federal law on the outcome of a contract (or tort) suit is not enough to support the arising-under jurisdiction. Responding to an argument that *Grable* equated an important federal issue with a claim arising under federal law, the Court replied:

> Whether Grable received notice adequate under [26 U.S.C.] §6335(a), we observed, was "an essential element of [Grable's] quiet title claim"; indeed, "it appear[ed] to be the only . . . issue contested in the case." This case is poles apart from *Grable*. The dispute there centered on the action of a federal agency (IRS) and its compatibility with a federal statute, the question qualified as "substantial," and its resolution was both dispositive of the case and would be controlling in numerous other cases. Here, the reimbursement claim was triggered, not by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court, and the bottom-line practical issue is the share of that settlement properly payable to Empire. *Grable* presented a nearly "pure issue of law," one "that could be settled once and for all and thereafter would govern numerous tax sale cases." In contrast, Empire's reimbursement claim . . . is factbound and situation-specific. . . . In sum, *Grable* emphasized that it takes more than a federal element "to open the 'arising under' door." This

case cannot be squeezed into the slim category *Grable* exemplifies.

126 S. Ct. at 2137 (internal citations omitted; paragraphs merged).

What the Court said about *Grable* in *Empire Healthchoice* can be said here too. We have a fact-specific application of rules that come from both federal and state law rather than a context-free inquiry into the meaning of a federal law. State issues, such as the amount of damages, may well predominate. Plaintiffs do not challenge the validity of any federal agency's or employee's action. If they did—for example by suing the United States under the Federal Tort Claims Act on a theory that the air traffic controllers were negligent—then the supplemental jurisdiction would support resolution in federal court of the claims against Southwest Airlines, Boeing, and Chicago. See 28 U.S.C. §1367(a), which changes the outcome of *Finley v. United States*, 490 U.S. 545 (1989).

The Supreme Court thought it significant in *Grable* that only a few quiet-title actions would present federal issues. That enabled the Court to conclude that its decision would not move a whole category of litigation to federal court or upset a balance struck by Congress. Things are otherwise with air-crash litigation: defendants' position, if accepted, would move a whole category of suits to federal court. And it would upset a conscious legislative choice—not one made in §1331, perhaps, but surely the one made when 28 U.S.C. §1369 was enacted in 2002. That statute permits suit in federal court when a single air crash (or other disaster) leads to at least 75 fatalities and minimal diversity is present. Those lines would be rendered meaningless if, as defendants maintain, every aviation case is federal. Section 1369 makes sense only if transportation disasters are litigated in state court unless they satisfy the new statute's terms.

Although defendants stress that air transportation spans multiple states (the flight in question departed from Baltimore-Washington International Thurgood Marshall Airport, and Southwest Airlines' system crisscrosses the nation), which makes a uniform set of rules desirable, they do not contend that all state variation is impermissible. Damages, for example, depend wholly on state law. And one must be wary of uniformity-based arguments articulated at a high level of generality. How flights proceed while airborne, and which safety devices an airframe should carry, may well be subjects on which only one national rule is tolerable. Many other subjects, however, vary from airport to airport. The situation at Midway Airport illustrates this vividly.

We've already mentioned the length of its runways. Had flight 1248 landed at Chicago O'Hare International Airport, whose shortest runway is about 1,000 feet longer than Midway's longest, there would have been no problem. (O'Hare's longest runway is 13,000 feet, with open ground after that before a plane encounters cars and trucks.) O'Hare's very existence complicated the landing of flight 1248. Because Midway and O'Hare are less than 15 miles apart, the paths of planes approaching each airport must be managed carefully to avoid collisions. On December 8, 2005, a path that would have enabled flight 1248 to land into the wind—and thus at a slower speed relative to the ground—would have taken it through space reserved for planes approaching O'Hare. Flight 1248 therefore had to land with the wind at its tail, adding approximately 1,000 feet to the length required for it to stop. See the National Transportation Safety Board's preliminary advisory on this accident (Dec. 15, 2005). Location-specific considerations of this kind demonstrate that resolution of plaintiffs' claims in state court will not jeopardize any uniform rule that might be applied at Phoenix or Anchorage.

Midway was built in 1923 to accommodate the planes of that era; a residential neighborhood grew up around it and severely limits expansion. Runways well suited to the DC-3 and the Lockheed Constellation are uncomfortably short for large jets in foul weather. Federal authorities might not allow the construction today of a commercial airport with runways the length of Midway's, and hemmed in by residential development. But neither have they ordered Midway to be closed or limited to propeller airplanes. The City and the federal officials have negotiated for years about proposals to lengthen Midway's runways or establish buffer zones around them. Lengthening the runways would require the acquisition of residential land and extensive rerouting of local streets. Whether to make such changes is not something determined by "uniform" norms. Federal law can and does lay down minimum standards—*given* the layout of Midway Airport, a landing is safe if certain conditions are met. But even then whether to land is a decision made by the pilot rather than federal regulators and is influenced by factors such as whether all safety equipment is functional and whether the crew has experience with snow.

Appeals to "uniform national rules" do not explain Midway's operational limits or fully control landing operations there during snowstorms. A Boeing 737-700 requires between 3,500 and 4,700 feet of dry runway (depending on the plane's landing weight) at Chicago's altitude in calm winds, with flaps at 40/ and the use of brakes but not thrust reversers. (Boeing document D6-28326-6, "737 Airplane Characteristics for Airport Planning," page 291.) How that figure translates to an actual landing affected by wind, snow, and thrust reversers, and how much safety margin should be preserved for the benefit of passengers and people near an airport, is the sort of situation that is governed by context-sensitive doctrines such as the law of negligence. The particulars

of flight 1248's landing may never recur; a search for a "uniform federal rule" to govern such a situation would be a hunt for a will-o'-the-wisp.

This circuit has held many times that claims related to air transport may be litigated in state court. *Hoagland v. Clear Lake*, 415 F.3d 693 (7th Cir. 2005); *Bieneman v. Chicago*, 864 F.2d 463 (7th Cir. 1988); cf. *Illinois v. Chicago*, 137 F.3d 474 (7th Cir. 1998). *Grable* does not change this conclusion. That some standards of care used in tort litigation come from federal law does not make the tort claim one "arising under" federal law. See *Vorhees v. Naper Aero Club, Inc.*, 272 F.3d 398 (7th Cir. 2001); *Rogers v. Tyson Foods, Inc.*, 308 F.3d 785 (7th Cir. 2002); *Chicago v. Comcast Cable Holdings, L.L.C.*, 384 F.3d 901 (7th Cir. 2004) (federal defenses do not justify removal, even if the federal issue is the only one in dispute). No court of appeals has held either before or after *Grable* that the national regulation of many aspects of air travel means that a tort claim in the wake of a crash "arises under" federal law. *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 375-76 (3d Cir. 1999), strongly implies that the "arising under" jurisdiction is unavailable; we now hold that this is the right conclusion.

The judgment is reversed, and the case is remanded to the district court with instructions to remand the litigation to state court.

A true Copy:

      Teste:

                              _____
                              *Clerk of the United States Court of Appeals for the Seventh Circuit*