In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-3032 & 08-3033

CITY OF JOLIET, ILLINOIS,

*Plaintiff-Appellee*,

*v.*

NEW WEST, L.P., and NEW BLUFF, L.P.,

*Defendants-Appellants*.

UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT and EVERGREEN
TERRACE TENANTS,

*Intervening Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6746—**Charles R. Norgle, Sr.**, *Judge*.

ARGUED JANUARY 12, 2009—DECIDED APRIL 9, 2009

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and
SYKES, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. For several years the City of
Joliet, Illinois, has been trying to acquire the Evergreen

Terrace apartment complex, which the City believes is so run-down that it constitutes a public nuisance. After the City commenced eminent domain proceedings in state court, New West, a partnership that owns the complex, removed the proceeding to federal court and filed a suit under 42 U.S.C. §1983 seeking an injunction and damages. The district court put the condemnation on ice and dismissed the §1983 action—erroneously, we held in *New West, L.P. v. Joliet*, 491 F.3d 717 (7th Cir. 2007). We directed the district court to take up the condemnation proceeding first, as its disposition could resolve some or all of the issues in the §1983 suit.

One of New West's arguments in the §1983 suit was that, because it has accepted a federal subsidy under §8 of the Housing Act of 1937, 42 U.S.C. §1437f, federal law preempts the City's proceeding. Our opinion had this to say:

> New West contends that §8 and the Fair Housing Act [42 U.S.C. §§ 3601–19] prevent condemnation of Evergreen Terrace, but it does not rely on any particular provision of that statute. Section 8 is a subsidy program, a carrot rather than a stick. HUD's regulations implementing the §8 program contemplate the possibility of the parcel's condemnation; they do not purport to forbid condemnations. See 24 C.F.R. §§ 245.405, 248.101. For its part, the Fair Housing Act forbids discrimination in housing programs without providing that any given housing development has a right to continued existence. Just as with §8, federal regulations implementing the FHA cover the demolition of

> housing projects. 24 C.F.R. Part 970, and exempt condemned buildings from these rules, see 24 C.F.R. §970.3. If Joliet thinks that a given parcel of land should be put to a public use, such as a park, and is willing to foot the bill, it is hard to see any obstacle in federal law.

491 F.3d at 721. In the district court the Department of Housing and Urban Development intervened and contended that §221 of the National Housing Act of 1954 (as amended in 1961 and 1966), 12 U.S.C. §1715*l*, and the Multifamily Assisted Housing Reform and Affordability Act of 1997, 42 U.S.C. §1437f note, block condemnation. The district court rejected that contention in reliance on our opinion, but, after concluding that HUD was making new arguments that we had not addressed, certified the case for interlocutory appeal under 28 U.S.C. §1292(b). We accepted the appeal, because we thought that HUD was relying on particular language said to preempt state and local condemnation laws. Now that the appeal has been fully briefed and argued, however, HUD and the other parties acknowledge that neither of these statutes has any clause preempting state law. At this point we could stop and affirm, relying on the law of the case. But because HUD was not a party to the first appeal, and has invoked two statutes that New West did not mention, we think it best to give the Department a full hearing and plenary decision.

First, however, a word on subject-matter jurisdiction. Joliet contends that there is none, because when the case was removed HUD was neither a party to the suit nor even

a lender to New West. The eminent domain proceeding arises under state and local law. Although New West raised preemption as a federal defense, it has long been understood that a federal defense does not support removal. See, e.g., *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58 (1987); *Gully v. First National Bank*, 299 U.S. 109 (1936); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, rehearing denied, 493 F.3d 762 (7th Cir. 2007). (The exception for "complete preemption," see *Franchise Tax Board of California v. Construction Laborers Vacation Trust*, 463 U.S. 1 (1983), does not apply; no one argues that federal law occupies the fields of housing or municipal powers.)

Still, the presence of the national government as a party with a security interest in the real estate supplies jurisdiction. 28 U.S.C. §§ 1444, 2410. It would be pointless to order this suit remanded, only to have HUD re-remove it in a trice. The Supreme Court has held that, when a suit is removed prematurely, the district court may proceed if it has subject-matter jurisdiction at the time it enters judgment. *American Fire & Casualty Co. v. Finn*, 341 U.S. 6 (1951); *Grubbs v. General Electric Credit Corp.*, 405 U.S. 699 (1972); *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996). This rule, coupled with the presence of HUD (and its desire to have the suit resolved in federal court), means that remand is unnecessary.

Three federal statutes are involved in this proceeding, and HUD contends that two of them preempt state and local law. The first statute, §8 of the Housing Act, 42 U.S.C. §1437f, provides federal rent subsidies for low-income tenants; as we observed in 2007, this statute does

not preempt any state or local law. HUD concurs. The second is §221 of the National Housing Act, 12 U.S.C. §1715*l*. This statute creates a program under which the federal government insures mortgages on privately owned, multifamily properties, some tenants of which receive rent subsidies under §8. HUD has established criteria that owners must meet before a loan is insured. HUD also is authorized to pay off the private lenders and become a direct lender. For descriptions of this program, see *Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998), and *Geneva Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974). The final statute, the Multifamily Assisted Housing Reform and Affordability Act of 1997, 42 U.S.C. §1437f note, allows HUD to renegotiate mortgages insured or assumed under §221 of the National Housing Act. High mortgage payments make it hard (sometimes impossible) for owners to offer below-market rents to their tenants; renegotiated mortgages with lower monthly payments cut the rents to the beneficiaries of the §8 program. Owners who seek lower mortgage payments under the 1997 Act must promise to keep their rental properties available to low-income tenants for 30 years.

Evergreen Terrace, which has 356 apartments, has participated in the §8 and §221 programs since the 1960s. By the late 1970s the owner was in default on its mortgage loans. HUD paid off the lenders, became the mortgage holder, foreclosed, and took title to the complex. New West purchased part of the complex from HUD in 1980 for $1, and the rest in 1982 for another $1. New West took out large mortgage loans, which HUD insured

under §221. New West promised both the lenders and HUD that it "will not permit or suffer the use of any of the property for any purpose other than the use for which the same was intended at the time this Mortgage was executed."

In 2001 New West asked HUD to restructure the mortgages under the 1997 Act, reducing the monthly payments. Both the Illinois Housing Development Authority and Heskin Signet Partners reported to HUD that the approximately 600 residents of Evergreen Terrace lack other available options for low-income housing. Relying on these reports, HUD approved the restructuring in 2006, paid off the original lenders, and became the lender (and mortgage holder) itself. As part of the transaction, New West promised that, for the next 30 years, the property "shall be used solely as rental housing with no reduction in the number of residential units unless approved in writing by HUD". New West simultaneously entered into new 20-year agreements with HUD for §8 subsidies to low-income tenants. These agreements undertake not to transfer, assign, or encumber the property without HUD's approval.

When we agreed to hear this interlocutory appeal, we understood HUD to argue that the contracts that New West had signed in 2006 themselves preempted any state and local powers of condemnation, and we directed the parties to address the question how New West could give away a governmental power that it never possessed. (Neither the City of Joliet nor the State of Illinois has made any promise to HUD about the maintenance of

Evergreen Terrace.) HUD's appellate brief responded to our inquiry by disclaiming this theory of preemption. The contracts do not affect state or local powers, HUD recognizes. Owners such as New West must comply with all state and local laws—indeed, 24 C.F.R. §883.310(b)(6) specifies that recipients of federal assistance are bound by all "[a]pplicable State and local laws, codes, ordinances, and regulations."

Why isn't eminent domain among these applicable state and local laws? HUD's answer is that condemnation would interfere with the purposes of §221 and the 1997 Act. Both statutes are designed to enlarge, or at least preserve, the stock of housing available for low-income tenants. The "findings" in §511 of the 1997 Act make this explicit. If Joliet can condemn Evergreen Terrace, 356 apartments for low-income tenants will disappear, and these tenants do not have ready alternatives. (That's what the Illinois Housing Development Authority and Heskin Signet Partners concluded.) Removing 356 units from the housing stock could undermine achievement of the national purpose and so is preempted, the argument concludes. This line of argument implies that local government cannot condemn *any* housing, whether or not the owner has secured federal financing—for demolition of unsubsidized units diminishes the supply, and drives up the price of remaining units, as surely as the demolition of units that already enjoy federal subsidies. Yet none of the litigants ventures an argument *that* bold.

The question at hand is whether a state or local law can be preempted by the "findings" and "purposes" clauses of

a federal statute, even though the state or local law does not conflict with any rule of law established in the federal statute. Recently the Supreme Court emphasized that preemption inferred from a clash of goals and objectives should not be used expansively, unless the agency has issued a preemptive regulation with the force of law, and that an agency's view that application of local law would interfere with the national objective is no substitute for such a regulation. *Wyeth v. Levine*, No. 06–1249 (U.S. Mar. 4, 2009), slip op. 17–25. Justice Breyer filed a concurring opinion to stress the importance of a preempting regulation, and Justice Thomas, concurring in the judgment, expressed doubt about this entire category of implied preemption.

HUD does not contend that any federal regulation prevents state and local governments from using eminent domain or otherwise exercises the federal power of preemption under the Supremacy Clause. One federal regulation issued under the statutes at issue does preempt state and local law, but HUD understandably does not rely on (or even mention) it. This regulation, 24 C.F.R. §248.183, says that no state or local law may prevent any borrower under the federal programs from prepaying the loan, and that no state or local law may set a cap on the rate of return that owners participating in the federal programs may realize. Subsection (c) of this regulation says that other state and local laws, such as zoning and building standards, are not preempted. So federal regulations not only do not contain the sort of clause that the Justices thought important in *Wyeth* but also state that most state property regulations survive.

True, this savings clause does not mention eminent domain, but the main point is that no federal regulation even tries to displace local governments' power to take ownership of property by paying just compensation.

The approach of *Wyeth* to one side, it is hard to see any conflict between federal and state goals, because (a) none of the three statutes at issue makes participation compulsory; it is not a violation of federal law for a given owner to remain outside the program, so it cannot be said that federal law demands that a particular apartment unit remain standing; and (b) the agreements by which private owners enter the program do not diminish state and local powers (as HUD concedes).

Private owners are entitled to withdraw their properties from the program at any time despite their 20-year and 30-year promises. All they have to do is pay off the federally insured loan. 24 C.F.R. Part 248. The conditions last only as long as the loans. If private owners can withdraw (and then demolish) their properties without violating any rule of federal law, why can't state or local governments acquire the properties through eminent domain and then withdraw and demolish them? The regulations treat condemnation as one legitimate source of proceeds used to prepay and retire the loans, and thus to escape the conditions. 24 C.F.R. §248.101. Indeed, the regulatory approval needed to prepay the loans and withdraw from the program voluntarily is not required when proceeds of condemnation are the source of funds used to pay off the loans. *Ibid*. By treating condemnation as a special case, one that removes the property from

an otherwise-required approval, the agency has shown that condemnation is possible. What's the point of a special rule for applying the proceeds of condemnation if, as HUD argues, condemnation is always preempted?

Another regulation provides that HUD's approval for changing a property's use is not required when the change results from eminent domain. 24 C.F.R. §245.405, §970.3. And that's not all. The documents that New West signed contemplate the possibility of condemnation. Paragraphs 6 and 8 of the loans and mortgages provide that the proceeds of condemnation must be paid first to the lenders (including HUD) until the loans have been satisfied; that's a strange proviso if condemnation is always forbidden by federal law. HUD dismisses all of these clauses, and its own regulations, as irrelevant because they are not issued under the 1997 Act, but the fact remains that there is no *affirmative* declaration of preemption in any statute or rule, no concrete conflict between condemnation and any part of the 1997 Act, and no good reason to think that the 1997 Act contravenes HUD's own regulations under §8 and §221.

All that can be said is that, when housing is withdrawn by prepayment (including prepayment made possible by just compensation paid for a taking), the statutory goal of increasing (or at least preserving) the stock of low-income housing is undercut. Yet HUD does not point to any decision of the Supreme Court holding a state or local law preempted by broad goals (such as that more housing is better than less, low prices better than high prices) or by a general declaration such as "there exists

throughout the Nation a need for decent, safe, and affordable housing", §511(a)(1) of the 1997 Act. Nor has HUD cited any decision of any federal court holding that §221 or the 1997 Act—or for that matter any other subsidy system, such as farm price supports or loan guarantees for veterans or small business owners, all of which include "findings" sections comparable to §511—preempts any state or local authority to take ownership through eminent domain.

That silence is telling. We do not deal here with a city or state as regulator of private conduct. Eminent domain is a governmental power. Many decisions of the Supreme Court hold that only a clear statement in a national statute can supersede a governmental body's own operations. See, e.g., *Cook County Solid Waste Agency v. Corps of Engineers*, 531 U.S. 159, 171 (2001); *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991). HUD does not contend that any language in §221 or the 1997 Act supplies a "clear statement" of a national decision to displace eminent domain. As we have mentioned, there is no statement to that effect, clear or otherwise. There is only HUD's contention that condemnation will interfere with national goals. That stripe of argument was made in *Solid Waste Agency* and *Gregory*, where it did not prevail. Congress may well have the power to prevent state or local governments from condemning low-income housing, but it has not declared that it has exercised that power; there has been no debate, no opportunity for the states to make their positions known to Congress, no proposed regulation with preemptive

effect, and no focused decision by the Legislative and Executive Branches of the national government.

Quite apart from the Supreme Court's plain-statement canon for federalism cases, there is the principle that general statements of national policy do not preempt concrete laws. "Findings" and "purpose" clauses are common in federal statutes. Like the clauses in §511 of the 1997 Act, they are usually sweeping in scope and declare an urgent need to solve a problem. But in legislation details matter. How far will the legislature go, and what costs will it bear, to achieve its ends? "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (emphasis in original). When courts rely on purpose clauses, rather than the concrete rules that the political branches have selected to achieve the stated ends, judges become effective lawmakers, bypassing the give-and-take of the legislative process. It is therefore no surprise that the Supreme Court does not think that declarations of purpose, however sweeping, preempt state or local laws. See *Hawaii v. Office of Hawaiian Affairs*, No. 07–1372 (U.S. Mar. 31, 2009), slip op. 10–11 (37 "whereas" clauses setting out congressional findings and reasons for adopting a joint resolution do not have any effect independent of the resolution's two operative clauses).

Consider *Puerto Rico Dep't of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495 (1988). A federal statute ended most federal price controls for petroleum and natural gas. The statute's purpose clause (and the accompanying committee reports) declared that it is bad policy to interfere with the market's pricing mechanism, in the absence of monopoly or equivalent concerns. Puerto Rico continued to enforce its own price controls for these products, and the producers contended that the Commonwealth's legislation was preempted by the combination of the purpose clause, the end of federal regulation, and the legislative history showing the intent behind these provisions. A court of appeals agreed and held the law preempted—but the Supreme Court reversed.

The Court explained: "While we have frequently said that pre-emption analysis requires ascertaining congressional intent . . . , we have never meant that to signify congressional intent in a vacuum, unrelated to the giving of meaning to an enacted statutory text. . . . Respondents have brought to our attention statements that may reflect general congressional approval of a free market in petroleum products, or general congressional belief that such a market would result from enactment of the [statute], or even general congressional desire that it result. But unenacted approvals, beliefs, and desires are not laws. Without a text that can, in light of those statements, plausibly be interpreted as *prescribing* federal preemption it is impossible to find that a free market was mandated by federal law." 485 U.S. at 501 (emphasis in original). In other words, it takes a federal command to preempt a state or local law; a conflict between a local

law and legislative aspirations does not displace another jurisdiction's law. *Wyeth* reiterated that point. Cf. *American Hospital Ass'n v. NLRB*, 499 U.S. 606 (1991); *Lincoln v. Vigil*, 508 U.S. 182 (1993). Similarly, Congress desired (and hoped) that §211 and the 1997 Act would increase the stock of low-income housing, but a text that preempts state or local legislation is not among the steps that Congress took toward that objective.

This is not to say that federal law leaves local powers unaffected. A state or local government is not free to use its powers in order to discriminate against persons of a particular race, for example. And federal law limits the use of condemnation powers (as well as zoning or building codes) to turn a jurisdiction into an all-white, upper-income enclave. See *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Cf. *Wisconsin Community Services, Inc. v. Milwaukee*, 465 F.3d 737 (7th Cir. 2006) (en banc). But HUD does not contend that Joliet has invoked the power of eminent domain with an intent, or an effect, forbidden by the Constitution or a federal statute; HUD maintains that the City does not *have* a power to condemn federally subsidized housing, no matter how run-down the building, no matter how large the remaining supply of housing for low-income tenants, and no matter the use to which the city will put the land. On HUD's view, a city is forbidden to acquire and raze a decrepit and dangerous building, near a brand new apartment block with unused low-income units, in order to replace the old building with a new park or city hall—and this is so even if the federal appropriation can be redirected to another

property to maintain the aggregate supply of low-income housing. (HUD does not contend that condemnation of Evergreen Terrace would leave it unable to spend its full appropriation.) Such a sweeping displacement of governmental authority cannot be imputed to §221 or the 1997 Act. It might be sensible to enact a system under which HUD could certify a lack of affordable housing in a given locale and thus block any steps to diminish the existing stock. But no federal statute gives HUD this authority, let alone one that can be exercised without notice to the cities whose powers will be diminished.

Although HUD concedes that no court has attributed any preemptive effect to §221 or the 1997 Act, it urges us to draw guidance from *Public Utility District No. 1 of Pend Oreille County v. United States*, 417 F.2d 200 (9th Cir. 1969), and *Morgan City v. South Louisiana Electric Cooperative Ass'n*, 31 F.3d 319 (5th Cir. 1994), amended and rehearing en banc denied (over dissent), 49 F.3d 1074 (5th Cir. 1995). These decisions held that federal law preempts state or local efforts to condemn rural electric utilities that enjoyed federal financing under the Rural Electrification Act, 7 U.S.C. §901 *et seq*. (At least one court of appeals has reached a contrary conclusion. See *Stilwell v. Ozarks Rural Electric Cooperative Corp.*, 79 F.3d 1038 (10th Cir. 1996).) As HUD sees things, the decisions of the fifth and ninth circuits show that local condemnation powers are incompatible with federally subsidized financing designed to achieve a federal goal (whether providing electricity to farms or housing to low-income renters).

Neither the fifth circuit nor the ninth discussed the clear-statement rule for preemption of core governmental

powers, or the need (which the Court stressed in *ISLA Petroleum*) to find a conflict with a concrete statutory text. Perhaps those principles were not argued in those cases. To the extent these courts think that federal financing routinely displaces state laws, their decisions cannot be reconciled with *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Comm'n*, 461 U.S. 375 (1983), and *Wabash Valley Power Ass'n v. Rural Electrification Administration*, 903 F.2d 445 (7th Cir. 1990). What is more, both the fifth and the ninth circuits stressed that the federal interest was not principally related to financing. The problem with local condemnation is that electricity is distributed by a *network*. Pull out one generating station or set of transmission lines, and the rest of the network can be adversely affected. "This is not an ordinary case because what is sought to be taken here is part of a system and [if one part is condemned] a question remains as to the capacity of the remaining portions of the system to function." *Pend Oreille*, 417 F.2d at 201. One jurisdiction's condemnation thus could affect consumers in other jurisdictions; that justified a federal role. There is no comparable network externality when one city condemns an apartment block.

New West, and a tenants' association at the apartment complex, advance additional arguments, none of which HUD supports. They contend, for example, that condemnation of Evergreen Terrace violates the Contract Clause (Art. I §10 cl. 1) because it will affect the contracts that New West has with other entities. But "the Contract Clause has never been thought to protect against the exercise of eminent domain." *Hawaii Housing Authority v.*

*Midkiff*, 467 U.S. 229, 243 n.6 (1984). A state cannot displace a contract by fiat, but it may take interests in contracts, as in other property. New West and the tenants' association contend that, if this is so, then Joliet must be trying to take HUD's mortgage interests in Evergreen Terrace, and as no state may acquire federal property against the wishes of the national government, see *Armstrong v. United States*, 364 U.S. 40, 43 (1960), it follows that the City's resort to eminent domain violates the Property Clause (Art. IV §3 cl. 2) or principles of intergovernmental immunity. Yet the national government does not own Evergreen Terrace, which Joliet proposes to acquire. HUD's interest is as a secured creditor of New West. No case of which we are aware holds that the Property Clause (or any other part of the Constitution) treats a federal loan as immunizing the borrower from state regulation (including eminent domain) on the theory that the state is "really" regulating the federal interest as a lender. One might as well say that if New West owed taxes, and the IRS had placed a lien on Evergreen Terrace, that step would prevent the City from using eminent domain (or a bankruptcy court from selling the building to satisfy New West's other creditors).

This eminent domain proceeding has been stalled since its institution more than three years ago. We trust that the district court will now bring it to a speedy conclusion.

AFFIRMED