In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-3879

PETHINAIDU VELUCHAMY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

FEDERAL DEPOSIT INSURANCE CORP., in its capacity
as receiver for Mutual Bank, Harvey, Illinois, and
in its corporate capacity,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 648— **William J. Hibbler**, *Judge*.

ARGUED NOVEMBER 2, 2012—DECIDED FEBRUARY 4, 2013

Before MANION, WILLIAMS, and HAMILTON, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Plaintiffs, members of the
Veluchamy family and the Veluchamy Family Founda-
tion, controlled Mutual Bank. In an effort to save the
bank from insolvency and at the request of FDIC-Corpo-
rate, they raised about $30 million mostly in the form
of note purchases. But after that money was raised in

2008, FDIC-Corporate requested another $70 million to keep the bank open, and Plaintiffs were not able to get that funding. In May and June 2009, regulators issued warnings that the bank would soon go under without more capital. On July 1, 2009, the board of Mutual Bank voted to redeem the $30 million in notes and convert the proceeds into personal deposit accounts belonging to two of the Veluchamys, essentially returning their money, but this transaction could not occur without the approval of FDIC-Corporate. *See* 12 U.S.C. § 1821(i). Thirty days later, without a response from FDIC-Corporate, the bank was declared insolvent, and the FDIC was appointed as the receiver of the bank. FDIC-Receiver moved quickly to arrange with United Central Bank to assume the bank's deposits, and Mutual Bank's branches opened as branches of United Central Bank the next day. Plaintiffs then filed proofs of claim with FDIC-Receiver seeking to redeem the notes and convert the proceeds into personal deposit accounts so that they could obtain depositor-level (i.e., high) priority in the post-insolvency distribution scheme, but FDIC-Receiver did not allow the claims.

Plaintiffs brought an Administrative Procedure Act ("APA") claim against FDIC-Corporate, alleging that they had been (1) misled into investing $30 million into the bank and (2) prevented from getting their money back on the eve of insolvency. The district court dismissed this claim as moot, but we dismiss on different jurisdictional grounds. This claim asserts that FDIC-Corporate's failure to approve the note redemption caused Plaintiffs injury, and that FDIC-Corporate should com-

pensate them for that injury in the form of cash and the use of the FDIC's own funds to create personal deposit accounts for them. But this request for substitute monetary relief constitutes a request for "money damages," which the APA does not authorize. *See* 5 U.S.C. § 702.

In addition, Plaintiffs asserted APA and Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") claims against FDIC-Receiver for rejecting their proofs of claim. The district court's dismissal of these claims was proper. We lack jurisdiction to consider Plaintiffs' APA claim against FDIC-Receiver because 12 U.S.C. § 1821(d)(7)(A) only permits such a claim if Plaintiffs first seek administrative review of the disallowance, which they did not. And Plaintiffs' FIRREA claim essentially challenges the FDIC's regulatory decision not to act on the bank's redemption approval request, when FIRREA's administrative claims process only contemplates claims premised on the acts of the *bank*, not the FDIC as regulator. Therefore we affirm.

## I. BACKGROUND

Because this case is considered on a motion to dismiss for failure to state a claim, we assume the facts alleged in the complaint to be true. No evidence outside the pleadings was submitted with respect to the jurisdictional arguments, so the jurisdictional analysis also assumes those facts to be true. *See Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 701 (7th Cir. 2003).

The Federal Deposit Insurance Corporation ("FDIC") is most typically known as the federal agency that insures

the accounts of a bank's depositors, but it also serves as a bank overseer and regulator. *See FDIC v. Ernst & Young LLP*, 374 F.3d 579, 581 (7th Cir. 2004). And when an insured bank fails, the FDIC acts in a receiver capacity, stepping into the shoes of the failed bank much like a trustee in bankruptcy. *Id.* As receiver, the FDIC attempts to preserve or enhance the value of the bank's assets and to dispose of them as quickly as possible, protecting depositors and maintaining confidence in the banking system. The parties refer to the FDIC acting in its regulatory capacity as "FDIC-Corporate," and in its receiver capacity as "FDIC-Receiver," and so do we.

Plaintiffs Pethinaidu Veluchamy, Parameswari Veluchamy, Arun K. Veluchamy, Anu Veluchamy, and the Veluchamy Family Foundation, a family foundation established by the individual plaintiffs, collectively own 93.2% of First Mutual Bancorp of Illinois, Inc., a holding company that was the sole owner of Mutual Bank at Harvey, Illinois, a state-chartered bank (the "Bank"). In 2007 and prior to June 2008, the Bank's capital category was "well capitalized," the highest and best level of capitalization that an FDIC-insured bank may have. *See* 12 U.S.C. § 1831o(b)(1).

However, after the Bank's June 2008 call report (a report on the financial conditions of a bank submitted quarterly to the FDIC, *see* 12 U.S.C. § 1817), FDIC-Corporate notified the Bank that its capital category was downgraded to "adequately capitalized," and that it would need an additional $30 million of capital in order to be

restored to "well capitalized" status. Plaintiffs met this requirement before the next call report was due in September 2008, arranging for the purchase of millions of dollars of notes from the Bank and additional shares of First Mutual, among other actions. Most of the $30 million infusion through note purchases came from Plaintiffs themselves. After FDIC-Corporate reviewed these transactions in September 2008, the Bank's "well capitalized" status was restored.

According to Plaintiffs' depiction of events, the rug was soon pulled out from under them through a series of tag-team regulatory actions by FDIC-Corporate and the Illinois Department of Financial and Professional Regulation (the "IDFPR"), which regulates state-chartered banks, over the next several months. On December 30, 2008, without any further examination of the Bank, the IDFPR and FDIC-Corporate ordered the Bank to develop an acceptable "Capital Plan" within 60 days (the reasons for this are not alleged in the complaint). On February 10, 2009, the Bank filed a "Preliminary Response" outlining how it would maintain "well capitalized" status, but FDIC-Corporate revoked that status the following day because it did not believe that approximately $6 million of the notes sold by the Bank in 2008 should be considered capital, and because of an additional $40 million in capital losses that FDIC-Corporate had discovered. In March 2009, IDFPR issued a "Section 51 Order," *see* 205 ILCS § 5/51, stating that it intended to take control of the Bank if it did not satisfy certain capital ratio benchmarks within 60 days (May 2009). Soon thereafter, Plaintiffs arranged for the infusion of

another $6 million or so in capital, keeping the Bank "adequately capitalized" and staving off the threatened IDPFR takeover. But on April 28, 2009, a company (whose independence Plaintiffs question) hired by FDIC-Corporate to investigate the Bank reported that the Bank needed another $70 million in capital to stay solvent. On May 12, 2009, the IDFPR issued another Section 51 Order stating that it would take control of the bank if the Bank did not satisfy certain capital ratio benchmarks within 60 days (July 2009). On June 3, 2009, FDIC-Corporate notified the Bank that it was "critically undercapitalized," the worst level of capitalization that may be designated. *See* 12 U.S.C. § 1831o(b)(1). (There is no allegation that suggests that any of the regulators' capital assessments were inaccurate, nor is there any allegation that Plaintiffs as owners were not aware of these problems.)

At a special meeting on July 1, 2009, the Bank's board of directors resolved to seek FDIC-Corporate's approval to redeem approximately $30 million in notes. *See* 12 U.S.C. § 1828(i)(1) (FDIC-Corporate approval required for bank to redeem notes). In doing so, the board noted that Pethinaidu and Parameswari Veluchamy would agree to keep the proceeds of the redeemed notes on deposit at the Bank in an interest-free demand deposit account. This would give them the same highly-protected status as ordinary depositors in the case of bank failure, which was imminent. Otherwise, Plaintiffs—like other investors who may not have the privilege of such an arrangement—would drop to lowly creditor or equity holder status near the end of the post-insolvency distribution pecking order. The complaint alleges that this

transaction was approved for the legitimate business interests of the Bank, by providing liquidity (in the form of the personal deposit accounts) among other purported benefits. This seems like nothing more than rearranging deck chairs on the Titanic, or perhaps more like the captain rushing to secure a lifeboat for himself, especially since Plaintiffs confirmed at oral argument that this transaction would not have infused the Bank with more capital which would have saved the sinking ship. Nonetheless, given the motion to dismiss posture, we assume the transaction was done for legitimate reasons. The Bank submitted its request for FDIC-Corporate's approval the following day. With no response, the Bank again asked FDIC-Corporate to act on July 24, 2009.

On July 31, 2009, the IDFPR declared the Bank insolvent and appointed the FDIC as receiver. *See* 12 U.S.C. § 1821(c)(3)(A) (state supervisory entities have power to request that FDIC accept receivership of failed bank). FDIC-Receiver acted quickly, entering into a purchase and assumption agreement with United Central Bank to assume all the deposits of the Bank among other actions, and the Bank's branches opened as branches of United Central Bank the next day.

On November 3, 2009, Plaintiffs filed administrative proofs of claim with FDIC-Receiver. The complaint does not specify precisely what Plaintiffs asked for, nor did Plaintiffs include them in the record, even though this is the very basis for one of Plaintiffs' claims. The FDIC's appellate brief (and the district court, in part) frames the FIRREA claim as seeking the redemption of notes and

treating the proceeds as deposits, and Plaintiffs do not dispute this characterization, so we assume that to be the case. The administrative proofs of claim essentially sought to accomplish the same goal that the July 1, 2009 board resolution sought to achieve. On December 3, 2009, FDIC-Receiver "disallowed" (that is, rejected) their claims. Within 60 days, Plaintiffs filed a complaint in federal district court. *See* 12 U.S.C. § 1821(d)(6).

The complaint asserted an APA claim against FDIC-Corporate, alleging that it arbitrarily and capriciously misled Plaintiffs into believing that $30 million would be enough to save the Bank, and the claim also challenged FDIC-Corporate's failure to respond within 30 days to the Bank's request to redeem the notes. The complaint also raised APA and FIRREA claims against FDIC-Receiver for disallowing the claims. It sought declaratory relief and an order requiring the FDIC to "treat Plaintiffs Pethinaidu Veluchamy's and Parameswari Veluchamy's $23.6 million in subordinated debt as a deposit of the Bank" and to pay Plaintiffs a total of $9.3 million in damages.

The FDIC moved to dismiss on both jurisdictional grounds and the merits, and the district court granted the motions. Tackling the claims against FDIC-Receiver first, the district court dismissed the APA claim because it found that *de novo* challenges to the FDIC-Receiver's disallowance can only be made under FIRREA and not the APA. The district court then dismissed the FIRREA claim because FDIC-Receiver had no authority, absent FDIC-Corporate's approval, to redeem the notes, and

the court found it was statutorily barred from ordering the FDIC-Receiver to act otherwise. *See* 12 U.S.C. § 1821(j). The court then dismissed the APA claim against FDIC-Corporate on mootness grounds: because the court could not order FDIC-Receiver to redeem the notes, it reasoned, the injuries allegedly caused by FDIC-Corporate were not redressable by a favorable decision. Plaintiffs (hereinafter the "Appellants") timely appealed.

## II. ANALYSIS

We start by addressing Appellants' APA claim against FDIC-Corporate, whose alleged acts leading up to the Bank's insolvency are at the core of Appellants' complaint.

### A. Appellants' APA Claim Against FDIC-Corporate Is Barred Because It Seeks Money Damages

The district court dismissed the APA claim against FDIC-Corporate as moot, but as discussed above, Appellants' complaint specifically seeks damages in the form of cash payments and an order directing the FDIC to treat two of the Appellants' $23.6 million in subordinated debt as bank deposits. As the FDIC notes, granting this latter request would require the "FDIC to provide money to repurchase the notes and utilize the proceeds to establish a deposit account for the Veluchamys" (Appellee's Br. at 26), but they do not suggest that this is somehow impossible to accomplish even at this late stage, and the FDIC obviously has not acquiesced to Appellants'

demand for millions of dollars in cash payments. There-fore, Appellants' APA claim against FDIC-Corporate is not moot, and the FDIC does not seriously argue other-wise.

The APA claim is, however, jurisdictionally barred for another reason: it seeks money damages. The relevant portion of the APA, 5 U.S.C. § 702, provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dis-missed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

(Emphasis added). As the Supreme Court has explained, the United States has not waived its sovereign immunity when it comes to APA claims seeking money damages. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). A party seeks "money damages" if he or she is seeking "substitute" relief, rather than "specific" relief. *Id.* at 262. In other words, "[money] [d]amages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988)).

Whether the relief sought is "substitute" or "specific" is the touchstone of this inquiry. Therefore, the fact that "a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages,'" *Bowen*, 487 U.S. at 893, if that sum of money constitutes "the very thing" to which the plaintiff claims he is entitled. For example, in *Bowen*, Massachusetts claimed that it was statutorily entitled to about $6.5 million in Medicaid reimbursement which the Secretary of Health and Human Services had denied. Though a successful suit would obviously result in an award of money, the Supreme Court found that Massachusetts's claim was for "specific relief ([which] undo the Secretary's refusal to reimburse the State) rather than for money damages" because it did not seek "relief that substitutes for that which ought to have been done . . . ." *Id.* at 910. On the other hand, even if a plaintiff does not specifically ask for a direct cash payment, the plaintiff may still be seeking "money damages" if the relief sought is "merely a means to the end of satisfying a claim for the recovery of money." *Blue Fox*, 525 U.S. at 262. In *Blue Fox*, the plaintiff subcontractor was owed money by a contractor with the federal government. Because the contractor became insolvent, the subcontractor filed an APA claim seeking an equitable lien on any funds that the government had not yet paid to the contractor under the contract. Though the equitable lien was not itself cash, the Supreme Court unanimously found this to be a request for money damages because the lien's "goal [was] to seize or attach money in the hands of the Government as *compensation*

*for the loss* resulting from the default of the prime con-
tractor." *Id.* at 263 (emphasis added). In other words, the
equitable lien was a *substitute* for the payment that
the contractor owed to the subcontractor; the sub-
contractor never asserted a specific entitlement to
the equitable lien itself.

Under these principles, Appellants' request for an
order requiring the FDIC to "pay Plaintiffs Pethinaidu
Veluchamy and Parameswari Veluchamy $5.0 million in
damages," "pay Plaintiff Anu Veluchamy $1.7 million
in damages," "pay Arun K. Veluchamy $600,000 in dam-
ages," and "pay Veluchamy Family Foundation $2.0
million in damages," constitutes a request for money
damages. Appellants claim that FDIC-Corporate's al-
legedly misleading behavior caused them to pour their
money into the Bank, and the millions of dollars they
seek are meant to compensate them for their loss, which
is classic substitute relief.

Appellants' request for an order directing the FDIC
to treat $23.6 million in subordinated debt as a deposit
of the Bank also constitutes a request for money dam-
ages. As noted above, the FDIC explains that satisfying
this request would require it to provide money from
its own coffers (or should we say, taxpayer coffers) to
effectuate the notes repurchase and create personal
deposit accounts for Pethinaidu and Parameswari
Veluchamy, and Appellants do not dispute in their reply
that this is what their APA claim, if successful, would
require. Though what is essentially a transfer of money
from the FDIC's coffers into Appellants' pockets does

not itself make that relief "money damages" under the APA, *see Bowen*, 487 U.S. at 893, Appellants' additional failure to demonstrate (or even to assert) a *legal entitlement* to that specific money transfer does make such relief "money damages." The core of Appellants' claims is that FDIC-Corporate should have simply given permission for the Bank to redeem the notes in July 2009, which would have resulted in the creation of these personal accounts. But giving permission pre-insolvency is different from directly handing over money post-insolvency, and Appellants' demand for an order requiring the FDIC—potentially in a capacity far different from its role in July 2009—to spend government money to repurchase the notes and/or to create deposit accounts post-insolvency is clearly a *substitute* for that pre-insolvency permission. Like the equitable lien in *Blue Fox*, the relief Appellants request is "merely a means to the end of satisfying a claim for the recovery of money." *Blue Fox*, 525 U.S. at 262. Appellants' APA claim against FDIC-Corporate is therefore jurisdictionally barred.

At oral argument, Appellants argued for the first time that this APA claim was not for "money damages" because all they seek is the FDIC-Corporate's (belated) *approval* of the note redemption so that FDIC-Receiver may effectuate it now, or something to that effect. Such a request might conceivably overcome the "money damages" jurisdictional bar. But this request is not contained in the complaint, and arguments raised for the first time at oral argument are waived. *See Quality Oil, Inc. v. Kelley Partners, Inc.*, 657 F.3d 609, 614-15 (7th Cir. 2011). The FDIC prominently raised the "money damages" argument

in its appellate brief, clearly asserting what Appellants' request for relief would entail, yet Appellants' reply brief did not dispute the FDIC's characterization or argue that they were really just seeking FDIC-Corporate's permission for the note redemption. *See also United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc) ("burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction"). So we do not consider this argument.

### B.  Appellants' APA Claim Against FDIC-Receiver Is Barred Because Appellants Did Not Seek Administrative Review

We need not dwell long on Appellants' APA claim against FDIC-Receiver challenging its disallowance of the claims. As we explained in *Helm v. Resolution Trust Corp.*, 43 F.3d 1163 (7th Cir. 1995), FIRREA provides federal jurisdiction to review claims that are "disallowed" by FDIC-Receiver in only two circumstances. *See* 12 U.S.C. § 1821(d)(13)(D) ("*Except as otherwise provided in this subsection*, no court shall have jurisdiction over . . . any claim relating to any act or omission of . . . the [FDIC] as receiver." (emphasis added)). First, the disallowance may be challenged via an APA claim only after the relevant administrative agency has reviewed the disallowance. *See* 12 U.S.C. § 1821(d)(7)(A). Second, a party may seek *de novo* review of the disallowance pursuant to 12 U.S.C. § 1821(d) (this is known as the "FIRREA claim"). *See*

*Helm*, 43 F.3d at 1165-66. Appellants here did file a FIRREA claim, which is addressed next, but they also filed an APA claim challenging the disallowance. Because the disallowance was never administratively reviewed, we lack jurisdiction to consider the APA claim against FDIC-Receiver.

### C. Appellants' FIRREA Claim Fails Because It Essentially Challenges the FDIC's Action or Inaction as a Regulator, Which Is Not Cognizable Under Section 1821(d)

The FDIC appears to concede that there is no barrier to our consideration of the FIRREA claim against FDIC-Receiver on the merits (*see* Appellee's Br. at 18), though the heading of the brief's next section argues that we are barred from considering Appellants' claims against "either defendant" because of 12 U.S.C. § 1821(j), which provides that "no court may take any action . . . to restrain or affect the exercise of the powers or functions of the [FDIC] as a conservator or receiver." The district court found that Section 1821(j) barred the FIRREA claim. Furthermore, some circuits frame Section 1821(j) as a jurisdictional inquiry (as does the FDIC). *See, e.g., Hanson v. FDIC*, 113 F.3d 866, 870 (8th Cir. 1997). Therefore we address Section 1821(j)'s applicability here.

As the text suggests, Section 1821(j) "'effect[s] a sweeping ouster of courts' power to grant equitable remedies . . . .'" *Courtney v. Halleran*, 485 F.3d 942, 948 (7th Cir. 2007) (quoting *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995)). "Although this limitation on courts' power

to grant equitable relief may appear drastic, it fully accords with the intent of Congress at the time it enacted FIRREA in the midst of the savings and loan insolvency crisis to enable the FDIC . . . to expeditiously wind up the affairs of literally hundreds of failed financial institutions throughout the country." *Freeman*, 56 F.3d at 1398. One of the "powers or functions" of the FDIC as receiver is to take the "amounts realized from the liquidation or other resolution of the failed bank" and to distribute them to those with claims against the assets of the failed back, pursuant to the priority order set forth by 12 U.S.C. § 1821(d)(11). As the FDIC explains and Appellants do not dispute, Appellants are currently subordinate creditors who have fourth priority in the distribution scheme, but the redemption and deposit-via-redemption relief sought by the FIRREA claim would make them depositors, bumping them up to second priority along with all the other ordinary depositors whose savings were threatened by the Bank's failure. The question is whether this priority upgrade would "restrain or affect" FDIC-Receiver's function of distributing proceeds to claimsholders pursuant to the statutory priority scheme. Neither party cites any case on point, nor do we find any.

In the absence of further guidance, we conclude that the specific relief requested by Appellants' FIRREA claim would not be barred by Section 1821(j). In *Freeman*, the D.C. Circuit unequivocally affirmed the "sweeping" nature of Section 1821(j) and the importance of shielding FDIC-Receiver's important and time-sensitive stabilizing functions from court injunctions, but it went

on to say that "parties aggrieved by the FDIC's actions as receiver were [not] left entirely without remedies. In many cases, . . . aggrieved parties will have opportunities to seek money damages or other relief through the administrative claims process provided in 12 U.S.C. § 1821(d), and their claims are ultimately subject to judicial review." *Freeman*, 56 F.3d at 1399. Therefore, where the FDIC as receiver has disallowed a claim pursuant to the administrative process outlined in Section 1821(d) (as happened here), the judicial resolution of that claim expressly permitted by that subsection should not typically run afoul of Section 1821(j), another subsection of the same statute. *See Bank of Amer. Nat'l Ass'n v. Colonial Bank*, 604 F.3d 1239, 1246 (11th Cir. 2010) ("The operation of § 1821(j) does not leave Bank of America without a remedy. Its claim is one that can and should be pursued through the [§ 1821(d)] administrative claims process. . . . [O]ur sister circuits have held that all manner of claims are appropriate for resolution through the administrative claims process." (citing cases)); *cf. Courtney*, 485 F.3d at 949 (subsections of Section 1821 should be read in tandem with one another).

In this case, Appellants filed a Section 1821(d) administrative claim seeking second-level priority equal to that of ordinary depositors, and the statute expressly contemplates these kinds of administrative claims. *See* 12 U.S.C. § 1821(d)(5)(D)(i) ("The receiver may disallow any portion of any claim by a creditor or claim of security, preference, *or priority* which is not proved to the satisfaction of the receiver." (emphasis added)); *see, e.g., MBIA Ins. Corp. v. FDIC*, 816 F. Supp. 2d 81 (D.D.C. 2011) (ad-

dressing on the merits the plaintiff's claim of first-level priority status, while discussing applicability of Section 1821(j) separately for other claims). FDIC-Receiver's overall function of distributing amounts pursuant to the statutory priority scheme does not seem to be impacted simply because one claimant's priority assignment gets changed, at least in this case. The FDIC does not argue, for instance, that bumping up Appellants' priority treatment even at this late stage would force lower-priority claimants who already obtained their proceeds to disgorge them, or cause some other practical consequence that would prevent FDIC-Receiver from performing its essential, time-sensitive functions (and recall that at least one part of the FDIC's brief concedes that this claim may be considered on the merits). Section 1821(j) therefore does not bar Appellants' FIRREA claim against FDIC-Receiver. Indeed, given that the central purpose of the statute is to protect depositors in the wake of a bank failure, it would seem that someone with a meritorious claim that he is a depositor should be able to obtain that protection through the judicial process established by Section 1821(d)(6)(A)(ii).

Appellants, however, do not have a meritorious claim, for the simple reason that their alleged entitlement to depositor status is not actually a claim against the Bank. In other words, it is not premised on any action or inaction by the Bank. They do not argue, for instance, that they at one time had deposit accounts with the Bank which suddenly disappeared, that the Bank had legitimately agreed to create such accounts for them and then failed to do so, or that the Bank did anything

wrong. In fact, the Bank, under the allegedly well-intentioned leadership of Appellants, did everything within its lawful power to bestow such coveted depositor status upon Appellants. It was the *FDIC in its regulatory capacity* that prevented that from happening, and thus the real target of Appellants' claim, dressed in FIRREA clothing, is the FDIC-as-regulator, not the Bank. And Section 1821(d) does not contemplate claims challenging the FDIC's regulatory actions or inactions, only claims premised on the "depository institution's" actions or inactions. *See, e.g.*, 12 U.S.C. §§ 1821(d)(3)(B)(i) (referring to claims of "the depository institution's creditors"); 1821(d)(5)(A)(i) (referring to "any claim against a depository institution"). That is why the FIRREA claim is properly framed as being brought against the FDIC *as receiver*, i.e., in its capacity as the *Bank*. Without an actual claim against the Bank, the FIRREA claim fails.

But even if we were to consider under FIRREA the propriety of the FDIC's acts as a regulator, that is, its non-response to the Bank's last-minute note redemption request, Appellants' claim would still fail. The regulation governing such note redemption requests, 12 C.F.R. § 303.241, provides for an expedited process for review of requests to reduce or retire capital stock, notes, or debentures under Section 1828(i). Under the expedited processing provision, requests are deemed approved if no decision is made within 20 days. But that expedited processing is available only for well-capitalized institutions. Appellants' bank was not eligible for it. As of June 3, 2009, the Bank was "critically undercapitalized," and the request was made on July 2, 2009. If 20 days is the time

for expedited processing for such requests by stable banks, it is not unreasonable for the FDIC to take more than 28 days when the request comes from a financially troubled institution. When reviewing proposals by undercapitalized banks to restore capital (not retire capital), moreover, the FDIC is required to act "expeditiously, and generally not later than 60 days after" a capital restoration plan is submitted. 12 U.S.C. § 1831o(e)(2)(D)(ii). Again, if Congress deems 60 days "expeditious" for action on a capital restoration plan, 28 days could not constitute unreasonably delayed agency action when considering a critically undercapitalized bank's request to reduce capital. And remember that those are the provisions written for normal times, not for the worst banking and financial crisis in the last three generations, when Appellants' bank went under. Even apart from the issue of expeditiousness, it is also hard to see how responsible bank regulators could approve the retirement of capital by a critically undercapitalized bank on the brink of collapse so that the FDIC, taxpayers, and those with legitimate claims against the Bank would be left picking up the extra tab. *See* 12 U.S.C. § 1828(i)(4) (factors for approving reduction of capital include financial condition of bank, adequacy of capital structure, and future earnings prospects).

We lastly reject Appellants' request for leave to amend their complaint. Appellants never moved for leave to amend the complaint before the district court, no Rule 59(e) or 60(b) motion was ever filed, and Appellants do not argue that they lacked any opportunity to ask for such leave. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d

505, 513 (7th Cir. 2009). It is clear in any event that granting such leave would be futile.

### III.  CONCLUSION

For the above-stated reasons, we AFFIRM the judgment of the district court.