Beatrice BOYER, et al., Plaintiffs–Appellants, Cross–Appellees,

v.

BNSF RAILWAY COMPANY, doing business as Burlington Northern and Santa Fe Railway Company, Defendant–Appellee Cross–Appellant.

Nos. 14–3131 & 14–3182

United States Court of Appeals, Seventh Circuit.

Argued January 4, 2016

Decided June 1, 2016

Christopher D. Stombaugh, Keenan Law Firm, 148 Nassau Street, NW, Atlanta, GA 30303, for Plaintiffs–Appellants.

Barry Deacon, Deacon Law Firm, P.O. Box 3000, Jonesboro, AR 72403, Timothy R. Thornton, Jonathan P. Schmidt, Briggs & Morgan, P.A., 80 S. Eighth Street, 2200 IDS Center, Minneapolis, MN 55402–0000, for Defendant–Appellee.

Before BAUER, ROVNER, and WILLIAMS, Circuit Judges.

ROVNER, Circuit Judge.

These consolidated appeals are successive to our decision in *Irish v. BNSF Ry. Co.*, 674 F.3d 710 (7th Cir. 2012). *See* 7th Cir. Internal Operating Proc. 6(b). After we concluded that the plaintiffs-appellants in *Irish* had forfeited the argument they presented on appeal, the plaintiffs' counsel assembled a (mostly) new group of plaintiffs and refiled the same litigation in Arkansas state court in order to pursue that argument. The new suit was removed to federal court and transferred to the Western District of Wisconsin, where the district court dismissed the complaint for fail-

ure to state a claim on which relief could be granted. The defendant asked the court to sanction the plaintiffs' counsel pursuant to Federal Rule of Civil Procedure 11 and/or 28 U.S.C. § 1927 for pursuing frivolous claims and engaging in abusive litigation tactics, but the court denied that request, reasoning that although the plaintiffs' claims were all but foreclosed by our decision in *Irish*, they were not frivolous. The parties have cross-appealed. We affirm the dismissal of the complaint but reverse the denial of sanctions. We believe the record makes clear that the plaintiffs' counsel unreasonably and vexatiously multiplied the proceedings by filing suit in Arkansas, which had absolutely no connection to this case. Pursuant to section 1927, the defendant is entitled to its fees and costs for removing the case to federal court and successfully seeking its transfer to the Western District of Wisconsin.

## I.

Like *Irish*, this suit arises out of a July 2007 flood in Bagley, Wisconsin. Bagley is a small town situated in a valley along the eastern bank of the Mississippi River. Bluffs flank the river valley, and those bluffs are transected by ravines that drain the upper watershed into the river. A 500-year rain that occurred on July 17 and 18, 2007, sent torrents of water down those ravines, among them the Glass Hollow Drain. A Burlington Northern and Santa Fe Railway Company ("BNSF") bridge crosses over the Glass Hollow Drain near Bagley. Large amounts of debris swept along by the rainwater clogged the trestle undergirding the railway bridge, causing the water runoff to back up and inundate Bagley. Most of the town's 300 to 400 homes were flooded.

Kenneth Irish and three other Bagley residents filed a class-action suit against BNSF and two of its supervisory employ-

ees in Wisconsin state court in 2008. The suit blamed the flood of Bagley on faulty design and maintenance of the trestle by BNSF and its predecessors and sought damages based on theories of negligence and nuisance. BNSF removed the case to federal court where, after some initial procedural skirmishes, the district court dismissed the complaint as to BNSF pursuant to Federal Rule of Civil Procedure 12(b)(6). In relevant part, the court held that Wis. Stat. § 88.87 provides the exclusive remedy when the negligent design and maintenance of a railroad grade has caused an obstruction to a waterway or drainage course and resulted in flooding. That statute authorizes a person injured by such flooding to sue in inverse condemnation or for other equitable relief, but not for money damages; moreover, the statute requires the injured party to first file a claim with the railroad company within three years of the flood. § 88.87(2)(c). Because the plaintiffs had never filed such a claim with BNSF, their suit was barred; and, in any event, the statute foreclosed their claims for money damages.

The *Irish* plaintiffs appealed, and we affirmed. We began by noting that "[o]n its face, the statute would appear to bar the very suit for damages that the plaintiffs are pursuing." 674 F.3d at 713. According to the plaintiffs, it was BNSF's alleged negligence in maintaining the trestle that caused debris to accumulate and block the natural drainage of water through the Glass Hollow Drain, resulting in the Bagley flood. Wisconsin cases, including, *Pruim v. Town of Ashford*, 168 Wis.2d 114, 483 N.W.2d 242, 244–45 (Wis. Ct. App. 1992), and *Kohlbeck v. Reliance Constr. Co.*, 256 Wis.2d 235, 647 N.W.2d 277, 280 (Wis. Ct. App. 2002), indicated that the Wisconsin legislature meant to limit the types of claims that could be brought against governmental entities and, in this

case, railroads, whose negligent construction and/or maintenance of roadways and railroad grades resulted in flood damage. *Irish,* 674 F.3d at 713–14. The district court's holding that the statute controlled the plaintiffs' claims—and foreclosed their request for damages—was consistent with these cases. *Id.* at 714.

The plaintiffs contended on appeal that section 88.87 had a narrower scope than the courts had attributed to it, one that did not reach their claims for damages; but we found it too late in the day for them to make that argument. The plaintiffs' theory was that the statute was meant only to address construction defects that would give rise to a continuing nuisance—i.e., repeated flooding—rather than shortcomings in maintenance; and the Bagley flood, they argued, was the result of faulty maintenance of the BNSF trestle as opposed to its design. We had some concern that the plaintiffs were making a belated effort to recast their complaint (which was rife with references to the allegedly faulty design and construction of the trestle), but the dispositive point, in our view, was that they had not developed this argument in the district court. The plaintiffs' central argument below had been that section 88.87 was a governmental immunity statute that applied to private parties only when they were affiliated with government entities, which BNSF was not. 674 F.3d at 714–15. Only in a few isolated sentences in their memorandum opposing the motion to dismiss had the plaintiffs hinted at a distinction between design and construction flaws on the one hand and maintenance defects on the other, and this was not enough to have put the district court on notice of the argument they were making on appeal. *Id.* at 715. The argument was therefore forfeited, and as "this [was] not the rare civil case in which the forfeiture might be overlooked," there was no need to reach its merits. *Id.* at 716. The dismiss-

al of the plaintiffs' complaint was affirmed. *Id.*

Our opinion in *Irish* opened with this observation: "This is a lawsuit in search of a viable theory of recovery." *Id.* at 711. And in discussing the forfeiture of the plaintiffs' appellate argument, we elaborated upon our opening remark:

> The short history of this case reflects the ever-shifting nature of the plaintiffs' arguments. When the case was removed to federal court, the plaintiffs dropped their class allegations and disavowed any federal claims, in the hope that the case would be returned to state court. In their amended complaint, the plaintiffs cited section 88.87 as support for their claims, contending that the defendants had violated the obligations imposed by that statute. R. 58 ¶¶ 33(c) and (d), 35, but when Burlington Northern moved to dismiss the complaint on the ground that the relief the plaintiffs were seeking was not authorized, the plaintiffs turned around and contended that the statute did not apply to their claims. *See Irish v. BNSF Ry. Co.,* 2010 WL 4293578, at *4 ("Plaintiffs' position is somewhat surprising in light of the fact that they allege in their amended complaint that defendants violated Wis. Stat. § 88.87."). When the district court, after dismissing the corporate defendant[ ] from the case, solicited supplemental briefing as to the appropriate disposition of the individual defendants, the plaintiffs sought leave to amend their complaint a second time in order to raise the very sorts of federal claims (among others) that they had disavowed when they filed their first amended complaint. They also attempted to make other arguments that the district court appropriately characterized as untimely. And on appeal, as we have discussed, they have attempted to challenge the dismissal of their suit on

the basis of an argument that they never developed below. As Judge Crabb so aptly observed, "Although the losses plaintiffs sustained in the 2007 flood are unfortunate, even a sympathetic plaintiff is not entitled to an endless number of chances to reinvent this lawsuit until he discovers a version that leads to victory." R. 89 at 3.

674 F.3d at 715–16.

These comments fell on deaf ears. Sixteen months after we affirmed the dismissal of the *Irish* suit, and shortly before the pertinent Wisconsin statute of limitations ran, attorney Christopher D. Stombaugh, one of the lawyers who represented the plaintiffs in the *Irish* appeal,[1] sought a new venue in which to continue the pursuit of relief for the residents of Bagley: in conjunction with local counsel, he filed a virtually identical lawsuit on behalf of a (mostly) different set of current and former Bagley residents, led by Beatrice Boyer, in Arkansas state court. The *Boyer* complaint expressly invoked Wisconsin law as controlling, and set forth the same four claims under Wisconsin law that had been asserted in the *Irish* litigation: negligence per se, common law negligence, negligent creation and maintenance of a nuisance, and intentional nuisance. The factual allegations set forth in support of those claims were virtually identical to those made in the prior litigation, with the only substantive difference being that they omitted any allegations regarding design and construction of the railroad trestle. That revision was clearly aimed at our observation in the *Irish* appeal that the complaint at issue there did not appear to be based solely on negligent maintenance of the BNSF trestle. 674 F.3d at 714. The *Boyer* complaint

also set forth an identical demand for relief, including compensatory, treble, and punitive damages. The complaint posited that venue was proper in Arkansas because BNSF was licensed to do business there. BNSF, seeing things differently, promptly removed the case to the United States District Court for the Eastern District of Arkansas based on diversity of citizenship. *See* 28 U.S.C. §§ 1332(a)(1), 1441(a). Once the removal was accomplished, BNSF moved to transfer the case to the Western District of Wisconsin pursuant to 28 U.S.C. § 1404(a), noting that "no plaintiff resides in Arkansas, nothing bearing on plaintiffs' claims happened in Arkansas, and BNSF has no Arkansas contacts relevant to a flood in Wisconsin." R. 9 at 1.

In opposing the motion to transfer, the *Boyer* plaintiffs could not deny Wisconsin's strong ties to the suit; instead, they contended that deference should be given to their choice of forum and posited that Arkansas was not an unduly burdensome venue for BNSF. What is particularly noteworthy about the plaintiffs' response, however, was its exceedingly candid acknowledgments that the *Boyer* plaintiffs were seeking a different court to re-examine claims that had met with rejection in the Western District of Wisconsin and in this Circuit.

· As the old adage goes: a trial is the search for the truth. Plaintiffs have grave concerns whether the Wisconsin District Court will yield to the temptation of ruling against th[e] plaintiffs based on the prior case, rather than the merits of the arguments put before it. The Plaintiffs in this action are simply seeking a fresh pair of judicial eyes, in a

---

**1.** Stombaugh did not argue the *Irish* appeal, but his name was on the briefs and he filed a Circuit Rule 26.1 disclosure statement. His firm had also represented the plaintiffs in the

district court, although it does not appear that Stombaugh himself had appeared in the district court.

proper forum, to examine the merits of their arguments without a prejudice or predisposition stemming from prior litigation by other individuals. Because Arkansas is a proper forum for this case and BNSF has not met its burden to transfer, the motion to transfer must be denied.

R. 16 at 2. The plaintiffs returned to this theme later in their memorandum. After noting this court's ruling that the *Irish* plaintiffs had forfeited any argument that Wisconsin Statute § 88.87 did not apply to claims of negligent maintenance (as opposed to construction and design) of the BNSF trestle, the *Boyer* plaintiffs had this to say:

> According to the Seventh Circuit Court of Appeals ruling, these arguments were not sufficiently developed before Judge Crabb, therefore they do not constitute a bar under principles of res judicata or collateral estoppel. However, Plaintiffs fear that the Dist. Court of Wisconsin will be easily persuaded by such arguments based upon the prior contentious nature of the proceeding. Seeking out a judge that has ruled for you in the past in hopes that the judge will rule for you in the future is not the purpose of the "judicial economy" element of the balancing test under § 1404(a). Naturally, human nature being what it is, Plaintiffs retain grave concerns that it would be all too easy for the Western District of Wisconsin to make short shrift of Plaintiffs' robust state law arguments, unwilling to entertain further analysis. Such would not be judicial economy.

R. 16 at 9. It is therefore clear that one of the principal reasons that the plaintiffs had filed the suit in Arkansas, if not *the* principal reason, was in the hopes of finding a bench that was more receptive to its claims.

The district court in Arkansas granted BNSF's motion and transferred the case to the Western District of Wisconsin in a one-page order. The court stated at the outset:

> Based on the complaint, the plaintiffs are all residents of Bagley, Wisconsin; all alleged actions and damages are based in Bagley; and all causes of action and requested relief are based on Wisconsin law. Additionally, there was an earlier case in Wisconsin involving many of the same Plaintiffs and allegations.

R. 18. The court went on to acknowledge and quote from the plaintiffs' memorandum opposing transfer claiming their "grave concern" that the court in the Western District of Wisconsin would not give their renewed claims a fair hearing. The court dismissed that concern. "Since I seriously doubt that Plaintiffs' concerns about the Wisconsin court are well founded and there appears to be no other reason for Plaintiffs to have filed in Arkansas, Defendant's Motion to Transfer is GRANTED, and this case is transferred to the Western District of Wisconsin." R. 18.

The *Boyer* plaintiffs filed an appeal to the Eighth Circuit from the transfer order, and then, after BNSF filed a motion to dismiss the appeal because the transfer order was an interlocutory, non-appealable order, a petition for a writ of mandamus. BNSF asked the Court of Appeals to dismiss the appeal and to deny the mandamus petition. Pursuant to Federal Rule of Appellate Procedure 38, BNSF also asked the court to sanction the plaintiffs on multiple grounds: (1) the impropriety of the underlying litigation (including the plaintiffs' choice of an Arkansas forum); (2) filing an appeal from the interlocutory transfer order, and (3) filing a mandamus petition which did not demonstrate the sort of extraordinary circumstances necessary for granting such a petition. In a brief order,

the Eighth Circuit summarily dismissed the appeal, denied the petition for a writ of mandamus, and denied BNSF's motion for sanctions, all without comment.

The case thus returned to the Western District of Wisconsin, where it was assigned to Judge Crabb. BNSF in short order moved to dismiss the complaint. The court noted that in the new complaint, the plaintiffs were pursuing the argument that section 88.87 does not bar a claim against BNSF for negligent maintenance of the trestle, as opposed to negligent design and construction; and this was the very argument that we had deemed forfeited in *Irish* because it was developed for the first time on appeal. *Boyer v. BNSF Ry. Co.*, 2014 WL 4273271, at *2 (W.D. Wis. Aug. 28, 2014); *see Irish*, 674 F.3d at 714–15.

BNSF contended in the first instance that claim preclusion barred the *Boyer* plaintiffs from pursuing this line of argument, because it could have been raised in the earlier litigation; but the district court rejected the argument. Although there was no dispute that two of the three elements of claim preclusion under Wisconsin law were satisfied (an identity of the causes of action between the two suits and a final judgment rendered by a court of competent jurisdiction in the previous suit), the court was not convinced that there was an identity between the parties and their privies in the two cases. With the exception of three individuals whom the district court agreed should be dismissed because they were parties in *Irish*, the *Boyer* plaintiffs represented a different group of individuals whose properties were injured in the Bagley flood. Although they had suffered the same types of injuries in the same incident as the *Irish* plaintiffs, the court did not see how they could be treated as being in privity with the *Irish* plaintiffs. In particular:

[D]efendant does not explain how the plaintiffs in *Irish* could have represented the interests of the plaintiffs in this case who were not parties in *Irish*. Because *Irish* was not a class action, the plaintiffs in *Irish* did not have standing to seek relief for other property owners who were not plaintiffs. Thus, even if the plaintiffs in *Irish* had prevailed, any other property owner would have had to bring her own case against defendant to assert her own interests. If I accepted defendant's argument, it would mean that all property owners would have been forced to join *Irish* or forever forfeit their rights. Particularly because there is no indication that many property owners were even *aware* of *Irish*, that would not be a fair result.

*Id.* at *3 (emphasis in original).

The court agreed, however, that the *Boyer* complaint failed to state a claim on which relief could be granted. Although the *Boyer* plaintiffs posited that section 88.87 did not govern claims of negligent maintenance (including negligent inspection), the Wisconsin appellate court's decision in *Pruim, supra*, 483 N.W.2d 242, cast doubt on that position. The claim in *Pruim* was one based on both the negligent design *and* maintenance of a highway, but the court had found the claim in its entirety preempted by section 88.87. The plaintiffs attempted to distinguish *Pruim* on the ground that the allegedly faulty construction of the highway at issue in that case had given rise to a continuing nuisance, in other words, a condition that could be expected to result in repeated flooding and repeated lawsuits. In the plaintiffs' view, that was the sort of claim that the Wisconsin legislature was aiming at in section 88.87, not one based on negligence—including, in particular, negligent maintenance—giving rise to a one-time or rare event like the Bagley flood. The district court was not persuaded that the

distinction the plaintiffs were attempting to draw was a legitimate one, noting that "it is not clear why a failure to maintain the railroad property is any less susceptible to repeated damages actions than a failure to construct the railroad properly." 2014 WL 4273271, at *4. Even setting *Pruim* aside, the court did not think that the distinction withstood the language of section 88.87 itself. The court pointed out that the statute refers to both the construction and maintenance of a railroad grade, thereby indicating that negligence in either regard fell within the statute's scope. *Id.* at *5.

> The better reading of subsection (2)(a) is that it applies to any act by the railroad company related to the railroad grade that "impede[s] the general flow of surface water or stream water in any unreasonable manner so as to cause either an unnecessary accumulation of waters flooding or water-soaking uplands or an unreasonable accumulation and discharge of surface waters flooding or water-soaking lowlands." In other words, the important question is whether there is an allegation that the railroad caused damage by impeding water flow; it does not matter whether the cause was faulty construction rather than faulty maintenance.
>
> To the extent § 88.87(2)(a) leaves any room for doubt, it is resolved by § 88.87(2)(c), which says that a property owner may bring a claim if the "railroad company ... constructs and maintains a highway or railroad grade not in accordance with par. (a)." In other words, if the railroad company has impeded water flow in a manner prohibited by § 88.87(2)(a), then the statute applies, regardless [of] whether the problem is construction or maintenance. Plaintiff's distinction between "construction" and "maintenance" is simply not supported by the statutory text.

*Id.* at *5–*6. The court did not think it important that several passages in the introductory portion of section 88.87 mention construction but not maintenance. The court pointed out that the introduction also recognizes that "it is necessary to control and regulate the construction *and drainage* of all highways and railroad grades." *Id.* at *6 (quoting section 88.87(1)) (emphasis in district court's opinion). "Obviously, drainage problems could be caused by faulty construction or faulty maintenance, so § 88.87(1) is not evidence that the legislature viewed the scope of the law as narrowly as plaintiffs do." *Id.*

Finally, the court rejected the plaintiffs' contention that the statute, to the extent it preempted their common law claims, violated article I, section 9 of the Wisconsin Constitution, which guarantees the right of every injured person to a remedy. That provision, the court noted, had been construed to protect an individual's access to the courts rather than a particular legal remedy. 2014 WL 4273271, at *6.

The court concluded by rejecting BNSF's request for sanctions. The court noted that it had rejected BNSF's claim preclusion argument. And although the court had agreed with BNSF that section 88.87 barred the plaintiffs' claims, the court "[could not] go so far as to say that plaintiffs' claims are frivolous." *Id.*

The plaintiffs have appealed the dismissal of their claims, and BNSF has cross-appealed the denial of their request for sanctions.

## II.

The parties' cross-appeals present us with two principal issues. The first of these is whether the plaintiffs' common law claims for negligence and nuisance are preempted by section 88.87. As below, the plaintiffs have argued in their briefs that

the statute should be construed to reach only construction defects that give rise to a nuisance in the form of repeated flooding. Their claims, they have stressed, are based on a failure of maintenance which resulted in a one-time event. At oral argument, their counsel modified that argument to contend that the statute does not reach the failure to maintain the area upstream of the trestle by allowing debris to accumulate which would, in the event of a heavy rainfall, clog the trestle and cause a flood. Neither iteration of the argument is consistent with the language of section 88.87, and the second iteration has been forfeited, as we discuss below. The second issue concerns the conduct of the plaintiffs' counsel, and whether the district court abused its discretion in declining to find it sanctionable. Although we agree with the district court that the plaintiffs' claims themselves are not legally frivolous, we do conclude that counsel's decision to file the claims in Arkansas state court amounted to vexatious litigation conduct that multiplied the proceedings and warrants sanctions pursuant to section 1927.

■ Before we turn to the merits of the plaintiffs' claims, we must first address BNSF's contention that this suit is barred by claim preclusion. BNSF reasons that because the *Irish* plaintiffs pursued essentially the same claims for relief that the *Boyer* plaintiffs are now pursuing, based on the same underlying facts, for the same types of injuries, any and all arguments as to the preemptive scope of section 88.87 could and should have been raised in that suit. The critical issue, as the district court recognized, is whether we can say that there is an identity of interests between the plaintiffs in the *Irish* litigation and the plaintiffs in the instant litigation. 2014 WL 4273271, at *3; *see, e.g., Wis. Pub. Serv. Corp. v. Arby Constr., Inc.*, 342 Wis.2d 544, 818 N.W.2d 863, 870 (2012) (citing, as first

element of claim preclusion, identity between the parties or their privies in the prior and present suits). Certainly that was true as to the three *Irish* plaintiffs who were included among the 60 *Boyer* plaintiffs and whom Judge Crabb dismissed from this litigation. And we may assume for the sake of argument that it might also be true of the several spouses of the *Irish* plaintiffs. *Cf. Jensen v. Milwaukee Mut. Ins. Co.*, 204 Wis.2d 231, 554 N.W.2d 232, 234–36 (Wis. Ct. App. 1996) (issue preclusion barred wife from relitigating negligence question resolved against husband in prior action to which she was not a party but in which she actively participated). But even if these plaintiffs were dismissed, along with the four *Boyer* plaintiffs whom BNSF has identified as deceased, there remain 50 or so plaintiffs who were not named in the *Irish* litigation. Certainly these plaintiffs are similarly situated with the *Irish* plaintiffs, in that they resided in Bagley and their properties were damaged by the flood, but BNSF has not shown that these *Boyer* plaintiffs were in privity with any of the *Irish* plaintiffs, such that we can deem them bound by the judgment in *Irish. See generally Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 798, 116 S.Ct. 1761, 1766, 135 L.Ed.2d 76 (1996) ("[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings") (internal quotation marks and citations omitted); *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971) ("Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue

which stand squarely against their position."). We may therefore turn to the merits.

We begin by reviewing the relevant language of the statute.

(a) Whenever any ... railroad company ... has heretofore constructed and now maintains or hereafter constructs and maintains any ... railroad grade in or across any marsh, lowland, natural depression, natural watercourse, natural or man-made channel or drainage course, it shall not impede the general flow of surface water or stream water in any unreasonable manner so as to cause either an unnecessary accumulation of waters flooding or water-soaking uplands or an unreasonable accumulation and discharge of surface waters flooding or water-soaking lowlands. All such ... railroad grades shall be constructed with adequate ditches, culverts, and other facilities as may be feasible, consonant with sound engineering practices, to the end of maintaining as far as practicable the original flow lines of drainage....

(c) If a ... railroad company ... constructs and maintains a ... railroad grade not in accordance with par. (a), any property owner damaged by the ... railroad grade may, within 3 years after the alleged damage occurred, file a claim with the ... railroad company. The claim shall consist of a sworn statement of the alleged faulty construction and a description sufficient to determine the location of the lands alleged to have been damaged by flooding or water-soaking. Within 90 days after the filing of the claim, the ... railroad company shall either correct the cause of the water damage, acquire rights to use the land for drainage or overflow purposes, or deny the claim. If the ... company denies the claim or fails to take any action within 90 days after the filing of

the claim, the property owner may bring an action in inverse condemnation under ch. 32 or sue for such other relief, other than damages, as may be just and equitable.

Wis. Stat. § 88.87(2). In sum, if a railroad has constructed and maintains a grade (including supporting structures such as a trestle), and it unreasonably interferes with the drainage of natural man-made waterways, it is subject to a suit for equitable relief and liability in inverse condemnation (provided that timely notice of the claim has first been given to the railroad), but the railroad may not be sued for monetary damages under common law theories such as negligence and nuisance. *Pruim*, 483 N.W.2d at 244–45.

For precisely the reasons identified by the district court, we reject the plaintiff's threshold argument that section 88.87 reaches only those claims based on the faulty design and construction of a railroad grade and not claims related to shortcomings in maintenance. The statute repeatedly refers to both the construction and maintenance of railroad grades, and considering the central duty imposed by the statute—not to interfere with drainage and to prevent unnecessary flooding—we can see no reason to think that the Wisconsin legislature meant to regulate construction alone.

The introductory section of the statute recites the legislature's finding that "it is necessary to control and regulate *the construction and drainage* of all ... railroad grades so as to protect property owners from damage to lands caused by unreasonable diversion or retention of surface waters due to a ... railroad grade construction ...." § 88.87(1). It is true enough that this section does not mention maintenance, but, in context, the focus on construction is to be expected. As the statute recognizes, it is the construction of a new

railroad grade that "must inevitably result in some interruption of and changes in the pre-existing natural flow of surface waters . . . ." *Id.* But once the grade is created and the potential for obstruction of drainage is present, maintenance becomes as important as the initial design and construction of the grade to preventing flooding. Debris may naturally accumulate in or near a railroad trestle or culvert, for example, even if there was no flaw in their design or construction—thus the statute's recognition that "some interruption" in the flow of surface waters is "inevitabl[e]" once a railroad grade comes into being. Notably, then, the legislature recognized a duty not only to regulate the construction of railroad grades, but the drainage of such grades. Drainage is a term that logically encompasses maintenance as well as initial construction. And the particular maintenance actions that are necessary to preserve and promote drainage will depend in no small measure on the type of structure that is present and how it was designed.

The substantive duty imposed on the railroad by section 2 of the statute is thus one "not [to] impede the general flow of surface water or stream water *in any unreasonable manner* so as to interfere with drainage" or cause an unreasonable accumulation and/or discharge of water. § 88.87(2)(a) (emphasis ours). *See Kohlbeck, supra,* 647 N.W.2d at 280 (recognizing this duty as "the essence" of section 2); *Chicago & N.W. Transp. Co. v. Office of Com'r of R.R.s,* 204 Wis.2d 1, 553 N.W.2d 845, 850 (Wis. Ct. App. 1996) (Section 88.87(2) "imposes an affirmative duty on a railroad to refrain from impeding the general flow of water in an unreasonable manner when constructing *or* maintaining a railroad bed.") (emphasis ours) (citing *Van v. Town of Manitowoc Rapids,* 150 Wis.2d 929, 442 N.W.2d 557, 558 (Wis. Ct. App. 1989)); *see also id.* at 851 (noting that duty imposed by section 88.87(2) is ongoing

duty that does not end with construction of rail bed) (citing and quoting *Lemonweir River Drainage Dist. v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.,* 199 Wis. 46, 225 N.W. 132, 133 (1929), and *Soo Line R.R. Co. v. Office of Com'r of Transp.,* 170 Wis.2d 543, 489 N.W.2d 672, 677 (Wis. Ct. App. 1992)). That language is plainly broad enough to encompass failures of maintenance as well as construction. Moreover, given the obvious ways in which the sort of maintenance omissions we have mentioned can contribute to flooding, there is no logical reason to believe that the legislature meant to exclude maintenance from the coverage of the statute.

Any doubt in this regard, as the district court noted, is resolved by the remedial provision set forth in subsection 2(c). That provision states that in the event a railroad company "constructs and maintains . . . a railroad grade not in accordance with par[agraph] (a)," an injured property owner may file a claim with the railroad within three years of the injury. § 88.87(2)(c). The quoted passage makes clear that the duty not to obstruct the flow of water set forth in subsection 2(a) applies to both construction and maintenance.

It has not escaped our notice that this subsection requires the injured party to include in his claim a description "of the alleged faulty construction" while demanding no such description of any shortcomings in maintenance. But this requirement is appropriately read, we believe, as a means of identifying the railroad structure that altered the preexisting watercourse or drainage way and thus triggered the rail company's duty not to unreasonably interfere with the flow of surface water. That the subsection otherwise recognizes the possibility that the railroad has not maintained the grade in compliance with subsection 2(a) provides all the confirmation that is necessary that the Wisconsin legis-

lature intended for failures of maintenance to be covered by the statute.

In short, section 88.87 by its terms is not limited to faults in the construction of a railroad grade. If negligent maintenance, by itself or in conjunction with shortcomings in construction, results in flooding, the statute, and its limitations on the available remedies, applies to the claims of an injured property owner.

As we recognized in *Irish*, the Wisconsin Court of Appeals' decision in *Pruim* makes this very point. *See* 674 F.3d at 713-14. The injured property owner in *Pruim* alleged that the negligent construction and maintenance of a roadway shoulder and drainage culvert had caused flooding and erosion on his adjacent land.[2] The landowner sought damages to compensate him for the costs of the repairs to his land under, *inter alia*, a common-law nuisance theory against the municipality responsible for the roadway and culvert. *Pruim* held that this sort of claim was preempted in its entirety by section 88.87. "[T]he legislature decided to regulate and control strictly the types of claims that may be made by property owners against governmental entities regarding highway construction and repair. Common law nuisance actions are not allowed. The statute clearly and unambiguously forbids it." 483 N.W.2d at 245; *see Kohlbeck*, 647 N.W.2d at 280 (when state department of transportation breaches its duty not to unreasonably impede flow of surface water, an injured property owner may bring action in inverse condemnation or sue for appropriate relief other than damages (citing *Pruim*)); *see also Hoops Enters., III, LLC, v. Super Western, Inc.*, 345 Wis.2d 733, 827 N.W.2d 120, 123 (Wis. Ct. App. 2012).

We come then to the plaintiffs' argument that section 88.87 applies only to construction defects that result in repeated flooding (and which could thus be characterized as nuisances) rather than defective maintenance that results only in one-time (or rare) flooding like the Bagley flood that injured the plaintiffs. But the argument fails for multiple reasons.

First, to the extent the argument is premised on a distinction between construction and maintenance, it fails for the same reasons we have already discussed. The distinction is inconsistent with both the broad obligation not to unreasonably interfere with drainage imposed by section 88.87 and *Pruim*'s understanding of the statute.

Second, nothing in the statute itself supports the notion that its scope is limited to conduct that gives rise to repeated flooding. As a historical matter, it may be that the Wisconsin legislature enacted section 88.87 with the intent to overrule *Stockstad v. Town of Rutland*, 8 Wis.2d 528, 99 N.W.2d 813, 815–16 (1959). The court in that case was presented with a continuing or permanent injury: the reconstruction of a roadway allegedly had resulted in the contamination of a landowner's deep water well; and the court held that the injured property owner was entitled to pursue a common law nuisance claim under the statutory predecessor to section 88.87. *Pruim* noted that the subsequent enactment of section 88.87 may or may not have been a coincidence, although its effect was to overrule *Stockstad*. 483 N.W.2d at 244–45. But beyond that historical circumstance, nothing in the statute itself or the cases construing it suggests that statute was meant to apply only to nuisance fact patterns involving repeated

---

**2.** Recall that the statute also applies to roads and highways and the governmental agencies responsible for building and maintaining

them. To simplify matters, we omitted the references to roads and government agencies in our quotations from the statute.

or continuous flooding. The statutory language, as we have said, generally proscribes unreasonable acts that interfere with natural drainage, with no exception for shortcomings in maintenance (or for that matter construction), which give rise to isolated rather than repeated flooding. And as a matter of logic, it would be difficult to enforce such a distinction in practice. If the flooding is attributed to new railroad construction, a modification in an existing grade or trestle, or a change in maintenance procedures, for example, it may not be possible to determine *ex ante* whether the flooding will be an isolated or repeated event. Even where a statistically rare weather event plays a role in the flood, as it did in Bagley's case, there is no way to predict when and how often a similar weather event might recur thereafter. And if the railroad moves swiftly after a first-time flood to correct the underlying cause, how is that flood to be categorized under the statute as the plaintiffs understand it?

When we questioned the plaintiffs' counsel at argument about distinguishing between negligence that results in a onetime flood versus negligence that gives rise to repeated flooding, counsel changed course and pursued a different line of argument: that the Bagley flood was attributable not to the construction or maintenance of the trestle itself but rather to BNSF's failure to keep the area *upstream* from the trestle clear of debris, and *that* type of negligence is beyond the scope of section 88.87. It is not clear to us that this is a form of negligence distinct from that addressed by the statute. Section 88.87, after all, speaks of a broad duty not to interfere with the natural drainage of a waterway. An accumulation of debris upstream from a railroad structure would only matter because that structure might cause debris to gather and create a blockage in the event of heavy water runoff. In any case, we need

not consider the argument on its merits. It was made for the first time at oral argument, and that is far too late in the day. *See, e.g., Veluchamy v. F.D.I.C.,* 706 F.3d 810, 817 (7th Cir. 2013) (citing *Quality Oil, Inc. v. Kelley Partners, Inc.,* 657 F.3d 609, 614–15 (7th Cir. 2011)).

In sum, the plaintiffs' four common law claims are preempted by section 88.87. The premise of their claims—that BNSF failed to maintain the trestle by keeping it clear of debris—amounts to an allegation that the railroad unreasonably interfered with the natural drainage of the Glass Hollow Drain. This is conduct which falls within the scope of section 88.87. Consequently, the plaintiffs' remedies were limited to those specified by the statute, including equitable relief and inverse condemnation, but not money damages. And because the plaintiffs never complied with the notice requirements of the statute by timely presenting their claims to BNSF before filing suit, even that relief is foreclosed to them.

The plaintiffs contend that our interpretation of the statute effectively deprives them of a remedy in violation of article I, section 9 of the Wisconsin Constitution, which provides in relevant part that "[e]very person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character[.]" But as the Wisconsin Supreme Court has explained, "That section, though of great importance in our jurisprudence, is primarily addressed to the right of persons to have access to the courts and to obtain justice on the basis of the law as it in fact exists. No legal rights are conferred by this portion of the Constitution." *Mulder v. Acme–Cleveland Corp.,* 95 Wis.2d 173, 290 N.W.2d 276, 284 & n. 3 (1980). Put another way, the provision does not guarantee any particular legal remedy to an injured person. *See Messner v.*

*Briggs & Stratton Corp.*, 120 Wis.2d 127, 353 N.W.2d 363, 366 (Wis. Ct. App. 1984).

We have considered and rejected the plaintiffs' request that we certify to the Wisconsin Supreme Court the question whether section 88.87 is properly understood to apply to their claims. The statute's terms are sufficiently clear on their face. Moreover, *Pruim*'s holding construing and enforcing those terms has been consistently followed, and no case has called it into question in the more than 20 years since it was decided. This is not an appropriate case for certification.

■■ We turn to the question of sanctions. Below, BNSF asked the district court to impose sanctions pursuant to Rule 11 and/or section 1927. As we have noted, the district court denied the request in a brief paragraph, reasoning that although the plaintiffs' claims failed on their merits, they were not frivolous. The court did not cite section 1927 specifically in its decision, and as we noted in *Kapco Mfg. Co. v. C&O Enters., Inc.*, 886 F.2d 1485, 1493 (7th Cir. 1989), a court is not required to find that a party's claims are frivolous in order to find its attorney's conduct sanctionable pursuant to section 1927 as it would under Rule 11. It is thus apparent that the district court did not separately consider whether sanctions were appropriate under the former provision. For the reasons that follow, we conclude that sanctions are warranted under section 1927 based on counsel's decision to file the *Boyer* litigation in Arkansas.

■■■ Section 1927 authorizes a court to sanction an attorney who "multiplies the proceedings unreasonably and vexatiously" by requiring the attorney to "satisfy personally" the excess costs (including fees) "reasonably incurred because of such conduct." A finding of subjective bad faith on the part of the offending attorney will support the imposition of sanctions under

section 1927, but such a finding is not necessary; "objective bad faith" will also support a sanctions award. *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006) (collecting cases).

> If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious. To put this a little differently, a lawyer engages in bad faith by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law....

*In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985); *see also Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013); *Dal Pozzo*, 463 F.3d at 614; *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005); *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184 (7th Cir. 1992). Simple negligence, on the other hand, will not suffice to invoke section 1927. *Grochocinski*, 719 F.3d at 799; *Kotsilieris*, 966 F.2d at 1184–85. Our review of the district court's decision to grant or deny sanctions pursuant to section 1927 is deferential. *E.g.*, *Dal Pozzo*, 463 F.3d at 614 (review is for abuse of discretion). But where, as here, a court appears not to have considered sanctions pursuant to section 1927, and the record is otherwise fully developed and the pertinent facts are not in dispute, we may consider the propriety of section 1927 sanctions *de novo*. *Cf. Ambrosia Land Investments, LLC v. Peabody Coal Co.*, 521 F.3d 778, 786 (7th Cir. 2008) (legal issues unaddressed by district court may be resolved on appeal where record is developed and relevant facts are undisputed). We conclude that sanctions were required for the following reasons.

We agree with the district court that the plaintiffs' claim themselves were not frivolous. Our decision in *Irish* did not resolve the merits of the particular line of argu-

ment that the *Boyer* plaintiffs pursued below; and as we have discussed, the *Boyer* plaintiffs, to the extent they were not in privity with the *Irish* plaintiffs, were free to pursue that line of argument in the instant litigation. It is true that we expressed skepticism about the argument in *Irish*, but because we deemed it to have been forfeited, we did not resolve the argument on its merits. Nothing precluded the *Boyer* plaintiffs from pursuing it in a new round of litigation, nor did our decision in *Irish* constitute *stare decisis* on that point. The argument fails, for all of the reasons that the district judge and we have discussed; but it was neither foreclosed by our decision in *Irish* nor legally frivolous.

What our decision in *Irish* should have brought a stop to is the habit of the plaintiffs' attorneys perpetually altering their line of argument as the moment suits them. We cited this pattern with disapproval in the *Irish* decision itself and have repeated those observations here. Yet, the pattern has persisted. The argument presented below was that a failure of maintenance that results in a one-time flood is not covered by section 88.87. That is also the argument that the parties have briefed. Imagine our surprise then, when counsel was asked about that argument at oral argument and replied that we did not need to address it, as the real issue in the case was BNSF's failure to keep the area upstream of the trestle free of debris, as opposed to the failure to maintain the trestle itself. This is yet another change of position to an argument that was not raised below. And it is unacceptable. It is one thing to flesh out, winnow, or sharpen one's case as the record develops and counsel responds to the evidence and arguments of his opponent. It is another to repeatedly throw item after item at the wall to see what might stick.

■ What ultimately has persuaded us that section 1927 sanctions are in order, however, is counsel's decision to file the *Boyer* litigation in Arkansas. We cannot think of a better example of multiplying the proceedings needlessly, unreasonably, and vexatiously. The plaintiffs' claims have no tie whatsoever to Arkansas: none of the plaintiffs lived or live there; the flood did not occur there; no evidence related to the flood is to be found there; and BNSF is neither headquartered in Arkansas nor maintains its principal place of business there. Moreover, each of the plaintiffs' claims invoked Wisconsin law, so the plaintiffs were asking the Arkansas court to apply another court's substantive law. The one and only connection to Arkansas is that BNSF owns and maintains roughly 190 miles of track within Arkansas. *See* R. 16 at 16. Although that circumstance might well support the exercise of personal jurisdiction over BNSF in Arkansas, it has no connection with the events at issue in this suit.

The plaintiffs' counsel could not have reasonably believed that his choice of venue would survive either a motion to dismiss the case based on forum non conveniens (assuming BNSF did not remove the case to federal court), *see generally Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *Farm Bureau Mut. Ins. Co. of Ark. v. Gadbury-Swift*, 2010 Ark. 6, 362 S.W.3d 291, 295 (2010), or a section 1404(a) motion to transfer the case to the Western District of Wisconsin (assuming that BNSF did remove the case), *see generally Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997). As the briefing on BNSF's motion to transfer the case made patently clear, other than the plaintiffs' choice of forum, none of the factors bearing on venue (including the convenience of the parties and the witnesses and the interest of justice) pointed to Arkansas as an

appropriate forum in which to litigate this case. *See* § 1404(a). Indeed, it is absolutely telling that the only affirmative reason that the plaintiffs could articulate in opposition to BNSF's transfer motion, apart from the deference purportedly owed to their choice of venue, was the notion that Judge Crabb might be tempted to give the *Boyer* plaintiffs' claims short shrift given her rulings against the plaintiffs in the *Irish* litigation, so that review by a "fresh pair of judicial eyes" was in order. This was a virtual admission that the plaintiffs' counsel was forum shopping. And the choice of Arkansas, a state outside of this circuit, leaves no doubt that counsel was shopping not only for a different trial-level judge but a different appellate court. *See Nat'l Treasury Employees Union v. I.R.S.*, 765 F.2d 1174, 1177 n.5 (D.C. Cir. 1985) (R.B. Ginsburg, J.) ("The semblance of judge-shopping ... is ... a concern when a litigant discontinues a fray, only to start over again on another day.").

Filing the case in Arkansas was, in short, an objectively unreasonable decision. It was not only foreseeable but inevitable that BNSF would, upon removing the *Boyer* suit to federal court, seek transfer of the case to the Western District of Wisconsin and that the district judge in Arkansas would grant that motion. Correcting the plaintiffs' improper choice of venue imposed entirely unnecessary costs on BNSF (which was required to both appear in Arkansas and file the motion to transfer), not to mention the Arkansas district court (which was required to rule on the motion). Our decision in *Kapco* cited forum-shopping (there, the filing of a second complaint before a different judge in the same district) as one reason among several sustaining the imposition of section 1927 sanctions. 886 F.2d at 1492 ("The record sufficiently supports the district court's finding that Friedman filed the second complaint for the express purpose of

avoiding the district court's order and shopping for a different forum."). In this case, we believe the unreasonable selection of Arkansas by itself warrants the imposition of sanctions. There was not even an arguable basis for filing the case in Arkansas, and the memorandum that counsel filed in opposition to BNSF's transfer motion essentially admitted that the choice of forum was dictated by a desire for a different judge.

■ We have considered and rejected counsel's argument that because the Eighth Circuit, in resolving the *Boyer* plaintiffs' attempts (via appeal and mandamus) to overturn the transfer decision, denied BNSF's motion for Rule 38 sanctions, we should deem BNSF's renewed request for sanctions here an unwarranted attempt to relitigate a matter already decided and to circumvent the law of the case. For three reasons, we believe it is appropriate to consider and grant BNSF's sanctions request. Even if the first two of these reasons would not be sufficient by themselves to overcome the law of the case doctrine, the third, which relates to our broader familiarity with and understanding of counsel's conduct, supports our decision to revisit the matter of sanctions.

■ First, as a prudential doctrine, the law of the case doctrine is discretionary rather than mandatory. *See Pepper v. United States*, 562 U.S. 476, 506–07, 131 S.Ct. 1229, 1250–51, 179 L.Ed.2d 196 (2011); *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912) (Holmes, J.); *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995); *Redfield v. Continental Cas. Corp.*, 818 F.2d 596, 605 (7th Cir. 1987). For purposes of consistency, finality, and judicial economy, the doctrine pre-

sumes that once a court has decided a particular issue in a case, the issue should not be reopened without good cause. *See Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007); *Avitia*, 49 F.3d at 1227; *cf. Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997) ("the law of the case doctrine in these circumstances reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one"). But as this rationale suggests, it does not prohibit a court from revisiting an issue when there is a legitimate reason to do so, whether it be a change in circumstances, new evidence, or something the court overlooked earlier. *See Zhang v. Gonzales*, 434 F.3d 993, 998 (7th Cir. 2006); *Best*, 107 F.3d at 547. In this case, as a court which is much more familiar than our sister circuit with history of both the *Irish* litigation and the instant lawsuit, we believe we are better situated to evaluate counsel's course of conduct, including in particular the decision to file this suit in another forum.

Second, the underlying matters that the Eighth Circuit had before it were the plaintiffs' appeal of the district court's decision to transfer the case and their petition for a writ of mandamus. The filing of that appeal and the mandamus petition, both of which BNSF argued were frivolous, constituted two of the three grounds on which BNSF asked the Eighth Circuit to sanction the plaintiffs' counsel pursuant to Rule 38, and we believe that those grounds were the ones that the Eighth Circuit is most likely to have considered, and rejected, when it summarily denied BNSF's sanctions request. The other ground underlying BNSF's request for sanctions—the asserted impropriety of the underlying suit itself—was not a matter that was before the court other than as a basis for sanctions. Rule 38 necessarily focuses on what a party has done in the appellate court rather than the district court. *See Roth v. Green*, 466 F.3d 1179, 1188 (10th Cir. 2006) (quoting *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 118 n.4 (2d Cir. 2000)). All that was before the Eighth Circuit substantively was the request to dismiss the plaintiffs' appeal (as an unauthorized interlocutory appeal) and to deny the mandamus petition (as a petition which failed to demonstrate the sort of extraordinary circumstances warranting relief). Those matters did not require the court to evaluate the merits of the underlying suit (including the decision to file this case in Arkansas) except in the most tangential sense, let alone to evaluate the overall context and history of the litigation. So although we do have reason to believe that the Eighth Circuit considered and rejected the appeal and the mandamus petition as a basis for sanctioning plaintiffs' counsel, we have far less reason to believe that it considered and resolved the other basis on which sanctions were sought.

Third, as is particularly apparent to this court, counsel's decision to file the new case in Arkansas was not an isolated lapse in judgment but of a piece with the pattern of repeatedly shifting theories in search of an argument that might circumvent the Wisconsin statute. After we warned the plaintiffs' legal team (which included their current counsel) about that pattern in *Irish*, counsel chose to pursue the line of argument we deemed forfeited in an entirely different forum. That decision was a patent effort to evade the two courts (both the district court and this court) most familiar with the facts and history of the litigation concerning the Bagley flood.

Finally, we have concluded that it is appropriate to sanction Mr. Stombaugh, who has served as the plaintiffs' sole counsel in this appeal and one of its two lead attorneys below, pursuant to section 1927 notwithstanding the fact that he was not

solely responsible for representing the plaintiffs in the ill-advised Arkansas phase of the litigation. At oral argument, Mr. Stombaugh indicated for the first time that he was "surprised" when local counsel filed suit in Arkansas. To the extent that statement was meant to suggest that he was not involved with the decision to file the *Boyer* suit in Arkansas and thus should not be held responsible for that decision, we reject it. Mr. Stombaugh was listed as one of the plaintiffs' counsel on the complaint filed in Arkansas state court, he was one of the attorneys of record throughout the proceedings in the Arkansas state and federal courts (as he also acknowledged at oral argument), his name was on all of the relevant documents filed on behalf of the plaintiffs in the Eastern District of Arkansas, and it was an associate at his firm who signed the memorandum in opposition to BNSF's motion to transfer the case to the Western District of Wisconsin—the very memorandum admitting that the plaintiffs' goal in choosing Arkansas was to have a "fresh pair of judicial eyes" review the plaintiffs' claims. We thus have no doubt that Mr. Stombaugh has been active in the *Boyer* suit from its inception, and if he was not solely responsible for the decision to file the suit in Arkansas, he at least shares responsibility for that decision. As one of the attorneys who represented the *Irish* plaintiffs before this court, he would have been keenly aware of the substantial ties the underlying claims in this suit have to Wisconsin and the substantial proceedings that took place previously in the Western District of Wisconsin. Despite (and evidently because of) that awareness, he collaborated in an attempt to shop for a different judge and a different court of review in a forum that had no connection whatsoever to the claims and the underlying facts and served no interest other than the pursuit of counsel's short-sighted and misplaced strategic goals.

We asked BNSF's counsel to submit an accounting of the total fees and costs BNSF had incurred in connection with the initial detour into Arkansas. The submitted affidavit of BNSF's lead counsel documents the costs and fees that BNSF incurred with respect to each aspect of the litigation in Arkansas (including retaining local counsel, effectuating removal of the case to the district court, briefing the motion to transfer, and defending the plaintiffs' two-pronged appellate attack on the transfer decision) and reports total costs and incurred fees of $51,586.80. Of that amount, $17,011.00 was expended before the Eighth Circuit in connection with the plaintiffs' appeal, mandamus petition, and BNSF's request for Rule 38 sanctions. As we have said, we have no doubt that the Eighth Circuit considered the appeal and the mandamus petition in declining to impose sanctions at BNSF's urging, and so in deference to our sister circuit's judgment and the law of the case, we will excise that category of appellate fees and costs in determining the amount of sanctions to impose. We are satisfied that the balance of BNSF's reported fees and costs, totaling $34,575.80, were reasonably and necessarily incurred in connection with appearing in the case (in part through local counsel), removing it from state to federal court, and having it transferred to the Western District of Wisconsin. We believe that amount is adequate to compensate BNSF for the burdens imposed by the decision of plaintiffs' counsel to file the *Boyer* case in a patently inappropriate forum and is therefore a reasonable and appropriate sanction under section 1927. We order plaintiffs' counsel, Christopher Stombaugh, to compensate BNSF in that amount.

BNSF has also asked that we impose sanctions pursuant to Rule 38 for what it regards as a frivolous appeal from the

district court's decision to dismiss the plaintiffs' claims. We do not regard the appeal as frivolous. Again, we did not resolve in *Irish* the particular argument as to section 88.87 that the *Boyer* plaintiffs have pursued.

Although we have rejected that argument on its merits, the plaintiffs' understanding of the statute is not unreasonable.

## III.

We conclude that the plaintiffs' claims are barred by the terms of section 88.87. The plaintiffs' request to certify that question to the Wisconsin Supreme Court is denied. BNSF's request that we impose Rule 38 sanctions is also denied. Finally, the decision of plaintiffs' counsel to file this litigation in Arkansas state court was objectively unreasonable and vexatiously multiplied the proceedings, warranting sanctions pursuant to section 1927. We remand with directions to impose sanctions on the plaintiffs' lead counsel, Christopher D. Stombaugh, in the amount of $34,575.80. Costs of the appeal are awarded to BNSF.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.